[No. 23400. Department One. April 13, 1932.]

JAMES E. CRAIG, *Respondent*, v. RICHFIELD OIL COMPANY OF CALIFORNIA, *Appellant*.[1]

*Kerr & McCord* and *Bogle, Bogle & Gates*, for appellant.

*Patterson & Ross* and *Kennedy & Schramm*, for respondent.

[1]Reported in 10 P. (2d) 216.

BEELER, J.—This action, based upon the alleged breach of a so-called "modification of lease," was brought by the plaintiff, Craig, to recover rent which he maintains was due him for the use of his gasoline station, the amount of the rental being computed upon a basis of three cents on each gallon of gasoline delivered by the defendant, Richfield Oil Company, to the plaintiff at his gasoline station at Seattle, Washington, from June 1, 1929, to April 20, 1930. A trial to the court without a jury resulted in findings of fact from which it was concluded that the plaintiff was entitled to recover the sum of $2,950.46, and from the judgment entered thereon the defendant has appealed.

The facts are these: On December 27, 1927, one Schram and the respondent Craig entered into a written lease whereby the latter acquired possession of a small parcel of real estate situated at 5202 Tenth avenue northeast, Seattle, Washington, together with the gasoline service station located thereon. May 28, 1928, Craig leased this property to the appellant on a flat monthly rental of $125. Immediately thereupon, and as a part of the same transaction, the appellant sublet the premises to the respondent at a rental of one dollar per month, the sublease having coupled with it a sales agreement executed by the appellant and Craig, whereby the latter agreed to handle, *exclusively,* the appellant's products, consisting of gasoline, oils, greases, and the like. It should be noted parenthetically that the purpose of this circumlocution, and of the modification of the terms of the lease presently to be noted, was to protect the appellant from the charge of fixing the retail price of gasoline and from prosecution then being threatened by the Federal government.

The sales agreement contains this provision:

"The price of gasoline delivered hereunder shall be *four (4c) cents per gallon less than the retail service station price as established and maintained by the seller in Seattle,* Washington, on the date of delivery." (Italics ours.)

. From May 28, 1928, until on or about April 1, 1929, the parties operated under the sales agreement, the appellant paying Craig the sum of $125 per month as rental for the gasoline station, and credited him with a rebate of *four cents on each gallon of gasoline delivered to him.* On or about April 1, 1929, the parties executed the "modification of lease" whereby the rent reserved under the original lease was changed from $125 per month to a *contingent rental of three cents per gallon* for each gallon of gasoline delivered to Craig, and the sales agreement was amended by changing the sale price of gasoline from *"four (4c) cents per gallon less than the retail service station price"* to the *"posted tank wagon price of the seller."* The "modification of lease," to which we shall hereafter refer as "modified lease," in part, reads:

"The first party hereby agrees to pay to the party of the second part on the 10th day of each and every calendar month under said lease and this extension thereof, the sum of three (3c) cents per gallon for each and every gallon of Richfield Gasolines delivered to said premises by party of the first part, during the preceding calendar month, . . ."

It further reads:

". . . that paragraph third in said sales agreement shall be altered and amended as follows, to-wit: That the price for Richfield White gasoline, Richfield Aviation gasoline, and Richfield Ethyl gasoline, respectively, delivered under the terms of said contract and lease, shall be the current posted tank wagon price of the seller for each of said gasolines for Seattle, Wash. on date of delivery."

While the action is one to recover for rent accruing from June 1, 1929, to April 20, 1930, under the *modified lease,* nevertheless the real question to be determined is whether the term *"posted tank wagon price of the seller"* contained in the modified lease, meant anything different to the contracting parties at the time they executed that instrument, than the term *four (4c) cents per gallon less than the retail service station price* contained in the sales agreement.

At the trial below, a great number of sales slips were admitted in evidence. These sales slips show the gallonage delivered by the appellant to the respondent's gas station from time to time. Upon the face of each slip appeared the following notation, "special adjustment," and by reason of which the respondent was given a credit of four cents on each gallon of gasoline delivered to his station, with the exception that, during the months of April and May, 1929, a credit of only three cents per gallon was allowed.

At the trial, the parties were in serious dispute as to the significance of the notation appearing on these sales slips, the respondent contending that the "special adjustment" was intended and considered by both parties as a *rebate,* whereas the appellant contended that it referred to the contingent *rental* of three cents per gallon. The trial court, over the appellant's objection, permitted the respondent to introduce oral testimony to explain the notation, on the theory that it was susceptible to more than one meaning. If the term "special adjustment" meant *rebate,* the respondent would prevail, whereas if it meant *rental,* judgment would necessarily go for the appellant.

The court also permitted the respondent and his wife to testify concerning conversations between them and two of the appellant's representatives, who had induced the respondent to sign up the modified lease,

as to the meaning of the words "posted tank wagon price of the seller," contained in the modified lease. Error is assigned upon these rulings.

The evidence is clear and convincing that the modified lease was signed up at the instigation of the appellant's agents, and upon their repeated assurances to the respondent that the four cents per gallon *rebate* would remain unchanged, and that the only effect of the modified lease would be to change the rent from a definite or flat sum of $125 per month, as stipulated in the sales agreement, to a contingent rental of three cents per gallon on the total gallonage delivered monthly. The respondent Craig was asked:

"Q. Now, Mr. Craig, tell the court what you were told by those gentlemen when they got you to sign this modification, as to what you were to get under this contract, as modified? . . . A. I was pumping a lot of gas, and of course this three cents would amount to quite a lot more than $125 a month, an awful lot. . . . And Mr. Miller took out his pencil and showed me where it would be, and so did Mr. Owens, and my wife was there, so I said we would talk it over. And in two or three weeks I signed that modification. Q. And what did they figure it at for you? A. Four and three. Q. The four was what? A. Four cents off the retail price. Q. That is your differential? A. Yes. Q. And the three was what? A. That was to be paid once a month. Q. What was the three cents? A. That was my rental. Q. And was that so represented to you by the gentlemen when they got you to sign up? A. Yes. Q. Did you have anything to do with the preparation of any of the contracts, Mr. Craig? A. I did not."

Furthermore, it is quite clear that the appellant's agents who induced the respondent to execute the modified lease, themselves believed that the *rebate* which the respondent had received under the sales agreement, would not be affected by the execution of the modified

lease, but that he would receive, as previously, his differential of four cents per gallon. At the time the modified lease was signed up, the retail price of gasoline was four cents above the tank wagon price. The appellant's district manager, Hall, who assisted in procuring the respondent's signature to the modified lease, in answer to a question submitted by the court, so testified:

"In other words, when we signed the modification the retail price was four cents above the tank wagon price, and the three cents was what we termed rental. About that time we got into this Federal investigation, and from that point on we didn't dictate to the dealer the price at which he should sell his gas."

So, when we take into consideration the relationship existing between the parties; the fact that the appellant instigated the execution of the modified lease; the fact that the respondent was allowed a rebate of four cents per gallon under the sales agreement; the fact that the sales slips issued subsequent to the execution of the modified lease show a credit of four cents per gallon without indicating that it was for *rental;* the fact that the term "posted tank wagon price" had no significance in the trade; these facts, together with many other circumstances disclosed by the record, made the introduction of oral testimony essential and necessary so as to determine what was in the minds of the contracting parties at the time the modified lease was executed, and as indicating the objects or purposes the parties were seeking to acomplish thereby.

"It is a recognized rule of construction that the court will place itself in the position of the parties who made the contract as nearly as can be done, by admitting evidence of the surrounding facts and cir-

cumstances, the nature of the subject-matter, the relation of the parties to the contract and the objects sought to be accomplished by the contract." 2 Page on Contracts (1st Ed.), 1745.

See, also, *Mikusch v. Beeman,* 110 Wash. 658, 188 Pac. 780.

"Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and accordingly they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described. It is therefore an established canon of construction that in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into. General or indefinite terms employed in the contract may be thus explained or restricted as to their meaning and application. And the contract must be so construed as to give it such effect, and none other, as the parties intended at the time it was made. This rule appears to be applicable only where the terms employed are susceptible of more than one meaning. In such case it is the duty of the court not only to regard the nature of the instrument, but also to inform himself of the circumstances which surrounded the parties at the time, so as to interpret the language employed from the standpoint which the parties occupied when they executed the contract." 6 R. C. L., 849.

As already pointed out, the parties were in dispute as to the meaning of the notation "special adjustment" appearing on the sales slips. The respondent maintained it had reference to the four cents per gallon differential or *rebate,* while the appellant claimed it had reference to the contingent rental. Being suscepti-

ble of more than one meaning, oral testimony was properly admitted.

In the case of *Jones v. Standard Oil Company of California,* 164 Wash. 83, 2 P. (2d) 76, one of the questions under consideration was whether oral testimony was admissible to explain the meaning of the words "posted service station or posted plant price," contained in a sales agreement. We there said:

"In our opinion, the agreement of January 10 is subject to oral explanation, in so far as it refers to appellant's 'posted service station or posted plant price.' This clause apparently refers to two different schedules. The parol testimony offered by respondent in explanation of his theory concerning this contract was clearly admissible. It is evident that appellant did not guarantee to respondent any profit at all, as respondent could sell his gasoline at or below its cost to him, if he desired to do so. At the same time, the agreement apparently leaves the fixing of the price to respondent entirely to appellant, and it could, at its option, post such prices as would prevent respondent from being able to buy even at six cents a gallon less than the posted prices and still sell at a fair price or at the market price of gas in his vicinity. Appellant itself prepared the agreement of January 10, and, if the same be found ambiguous, must suffer the risk of having such ambiguity explained by oral testimony and the controversy submitted to a jury for determination."

So here, the lease, the sublease and sales agreement, as well as the modified lease, were all upon the printed forms furnished by the appellant. These documents, after being executed, were retained by the appellant. Here, as in the *Jones* case, *supra,* the appellant claimed the right under the modified lease to arbitrarily fix the price of gasoline. To place such a construction upon the contract, would enable the appel-

lant to force the wholesale price of gasoline down to the retail service station price. In fact, it clearly appears that the "posted tank wagon price," the "tank wagon price," the "wholesale price," or by whatever term designated, shortly following the execution of the modified lease equalled the retail service station price. This is conceded by the appellant in its brief:

"The evidence clearly shows that at the time the modification agreement (modified lease) was entered into the retail service station price of gasoline was four cents above the posted tank wagon price of the seller. Consequently, at the time the modification was executed respondent received a four-cent deduction from the retail service station price and in addition received a three-cent rental or a total of seven cents. *However, the evidence shows that the retail service station price gradually dropped until it was the same as the posted tank wagon price of the seller.*" (Italics ours.)

That it was the intent of the parties, at the time the modified lease was executed, that the respondent should continue to receive his four cents differential or rebate on each gallon of gasoline delivered to his station by the appellant, is established beyond cavil. To place any other construction upon the modified lease, would mean that the respondent would receive nothing whatsoever for handling and selling, exclusively, the appellant's gasolines, oils, and the like, except, of course, the three cents per gallon on the gasoline sold monthly as rental.

Furthermore, the evidence shows beyond dispute that it was understood between the parties that the modified lease merely changed the rental from a definite or flat basis to a contingent basis depending upon the number of gallons sold each month. It is equally clear that, in the minds of the contracting parties, the term "posted tank wagon price" in the modified lease

meant nothing more than the term "retail service station price" in the sales agreement.

Finding no error in the record, the judgment will stand affirmed. It is so ordered.

TOLMAN, C. J., PARKER, MITCHELL, and HERMAN, JJ., concur.