[Civ. No. 26740. Second Dist., Div. Two. May 20, 1963.]

THE SAMARKAND OF SANTA BARBARA, INC., Plaintiff and Appellant, v. COUNTY OF SANTA BARBARA, Defendant and Respondent.

Price, Postel & Parma and Robert M. Jones for Plaintiff and Appellant.

Robert K. Cutler, County Counsel, and Stanley C. Hatch, Deputy County Counsel, for Defendant and Respondent.

ASHBURN, J.—In eight causes of action plaintiff, invoking the welfare exemption of the Constitution,[1] and the Revenue and Taxation Code,[2] sought return of real property taxes paid to defendant county for the tax years 1955-56 to 1961-62, inclusive. Demurrer to its amended complaint was sustained with leave to amend but plaintiff declined to

[1]California Constitution, article XIII, section 1c: "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes and owned by community chests, funds, foundations or corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual. As used in this section, 'property used exclusively for religious, hospital or charitable purposes' shall include a building and its equipment in the course of construction on or after the first Monday of March, 1954, together with the land on which it is located as may be required for the use and occupation of the building, to be used exclusively for religious, hospital or charitable purposes."

[2]Revenue and Taxation Code, section 214: "Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:

"(1) The owner is not organized or operated for profit . . . .

"(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual;

"(3) The property is used for the actual operation of the exempt activity;

"(4) The property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder, member, employee, contributor, or bondholder of the owner or operator, or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession;

"(5) The property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes except where such use is clearly incidental to a primary religious, hospital, scientific, or charitable purpose;

"(6) The property is irrevocably dedicated to religious, charitable, scientific, or hospital purposes and upon the liquidation, dissolution or abandonment of the owner will not inure to the benefit of any private person except a fund, foundation or corporation organized and operated for religious, hospital, scientific, or charitable purposes;

"(7) The property, if used exclusively for scientific purposes, is used by a foundation or institution which, in addition to complying with the foregoing requirements for the exemption of charitable organizations in general, has been chartered by the Congress of the United States (except that this requirement shall not apply when the scientific purposes are medical research), and whose objects are the encouragement or conduct of scientific investigation, research and discovery for the benefit of the community at large.

"The exemption provided for herein shall be known as the 'welfare exemption.' This exemption shall be in addition to any other exemption now provided by law. This section shall not be construed to enlarge

amend, judgment was entered accordingly and it has appealed from that judgment which dismisses the action.

Two major problems are canvassed by counsel, (1) whether inclusion of the words ''educational, scientific or literary purposes'' in article II of plaintiff's charter (the article stating corporate purposes) disqualifies it for the welfare exemption, and (2) whether the healing balm of the curative provisions of section 268, Revenue and Taxation Code, has cured or can cure the failure of plaintiff to file claims for exemption or petitions for refund as required by other sections of the code.

Concerning the first problem it appears that ''at all times herein mentioned all of the property hereinbefore described was irrevocably dedicated to, and was used exclusively for, religious, charitable or hospital purposes, to wit: as a home for the care, maintenance and support of aged persons, and upon liquidation, dissolution or abandonment of the owner will not inure to the benefit of any private person, except a fund, foundation or corporation organized and operated for religious, hospital or charitable purposes''; also, that plaintiff qualifies in all respects for exemption under the Constitution and statute unless the use of the words ''educational, scientific, or literary purposes'' in the articles of incorporation dictates a denial of the exemption. In other words, the past and present *uses* of plaintiff's property have been fully charitable and the problem grows out of the declaration of *purposes* found in the articles. Articles II and IV are the pertinent ones; they are set forth in footnote 3.[3]

the college exemption. Property used exclusively for school purposes of less than collegiate grade and owned and operated by religious, hospital or charitable funds, foundations or corporations, which property and funds, foundations or corporations meet all of the requirements of this section, shall be deemed to be within the exemption provided for in Section 1c of Article XIII of the Constitution of the State of California and this section.''

[3]The bracketed words in the following copy of said articles II and IV were in them on the first Monday of March 1957, and at all times until they were deleted prior to the first Monday of March 1959. Said articles read as follows:

''ARTICLE II The specific and primary purposes for which the corporation is organized are:

''(a) To furnish food, lodging and medical care to elderly persons and to otherwise fulfill their wants and needs and provide for their life care;

''(b) To receive contributions from any persons or entities and to require payment for the benefits received from this corporation from persons able to pay in whole or in part therefor in order that greater benefits may be given to persons unable to pay therefor in whole or in part; and

''(c) To apply funds or property to other exclusively religious, chari-

The constitutional provision is not self-executing but confers upon the Legislature the power to grant exemptions to nonprofit organizations with respect to property ''used exclusively for religious, hospital or charitable purposes,'' which language requires the Legislature in the first instance to determine and declare what uses fall within this category. There is a presumption in favor of the legislative interpretation which will not be set aside unless clearly wrong. ''The presumption is in favor of constitutionality, and the invalidity of an act of the Legislature must be clear and unquestionable before the statute can be declared unconstitutional. We cannot adopt our own interpretation of a provision of the Constitution without regard to the legislative construction, and, where more than one reasonable meaning exists, it is our duty to accept that chosen by the Legislature. [Citations.] This fundamental principle is particularly applicable where, as here, the statute was enacted pursuant to an enabling provision of the Constitution and there is not only a reasonable legislative construction of that provision but also approval of that construction by the people on referendum.'' (*Lundberg* v. *County of Alameda*, 46 Cal.2d 644, 652 [298 P.2d 1].) Accordingly, the use in section 214 of the statute of ''scientific'' purposes

table, [educational], scientific, or [literary] purposes *to the extent that such application is in the judgment of the Board of Trustees consistent with the then existing obligation to provide for persons under the care of the corporation*; and

''(d) *To carry out all of the foregoing purposes in such manner as to promote the cause of Jesus Christ and His Kingdom.*'' (Italics added.)

''ARTICLE IV No distribution of gain, profits, or dividends shall be made to any member of the corporation or any private individual on dissolution or otherwise. Upon dissolution of the corporation any remaining money or property shall be distributed to the Fuller Evangelistic Foundation, a non-profit California Corporation, for use exclusively for religious, charitable, [educational], scientific or [literary] purposes; provided however, if at the time of such dissolution the Fuller Evangelistic Foundation is not actively and exclusively devoted to the furtherance of religious, charitable, [educational], scientific or [literary] purposes, such remaining money or property shall be applied as determined by the Board of Trustees to other evangelical religious or worthy charitable or educational purposes.

''No part of the activities of this corporation shall be devoted to carrying on propaganda, or otherwise attempting to influence legislation.

''Any business activities authorized or permitted hereunder shall never become the primary or principal purpose of the corporation but shall be engaged in only as an incident of and subject to the primary nonprofit purposes hereinabove expressed.''

or school purposes ("educational"), raises a presumption that those are or may be charitable purposes within the meaning of the Constitution. ▮ Moreover, when the Legislature recognizes as charitable any purposes "clearly incidental to a primary religious, hospital, or charitable purpose," it is on solid constitutional ground, as the cases have pointed out.

▮ *Estate of Henderson,* 17 Cal.2d 853 [112 P.2d 605], which deals with a will and gifts which are intrinsically charitable, defines the scope of a charity as follows, at page 857: "Since the enactment of the Statute of Charitable Uses during the reign of Elizabeth, aid to the aged and infirm has been recognized as charitable. (See cases cited in 5 Cal.Jur. 24.) Relief of poverty is not a condition of charitable assistance. If the benefit conferred has a sufficiently widespread social value, a charitable purpose exists. (Rest., Trusts, §§ 368, 374; *People* v. *Cogswell, supra* [113 Cal. 129 (45 P. 270, 35 L.R.A. 269)]; *Collier* v. *Lindley,* 203 Cal. 641 [266 P. 526]; 16 Cal. L.Rev. 478.) Thus, gifts or trusts for educational institutions (Rest., Trusts, § 370; *People* v. *Cogswell, supra*), the promotion of woman's suffrage (*Garrison* v. *Little,* 75 Ill. App. 402), the publishing of religious writings (Rest., Trusts, § 371; *Estate of Graham,* 63 Cal.App. 41 [218 P. 84]; see 16 Cal.L.Rev. 478 at p. 482), and even for the relief of dumb animals (*Estate of Coleman,* 167 Cal. 212 [138 P. 992, Ann. Cas. 1915C 682]; Rest., Trusts, § 374 (c)), have been held charitable. ▮ It is a matter of common knowledge that aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their fundamental wants. Every civilized community must provide facilities, either public or private, for the care of old people regardless of financial condition, and a bequest to such an institution to further its purposes is of enough social value to be designated as charitable." ▮ At page 858, it is said: "Thus students at a private school may be required to pay tuition fees to cover the cost of their instruction; yet a gift to such a school for the purpose of assisting in the education of its students is clearly charitable. (*Estate of Bailey,* 19 Cal.App.2d 135 [65 P.2d 102]; *People* v. *Cogswell, supra; Estate of Bartlett,* 122 Cal.App. 375 [10 P.2d 126]; Rest., Trusts, § 370.)" This broad concept of a charity runs through the later cases dealing with the welfare exemption from property taxation.

■ *Fifield Manor* v. *County of Los Angeles,* 188 Cal. App.2d 1, 7-8 [10 Cal.Rptr. 242]: "It is a generally recognized fact that modern miracle drugs and intensive study of geriatrics have lengthened the lives of our people, especially those past 60, to a remarkable extent in recent years. The Congress in an act passed September 2, 1958, entitled 'White House Conference on Aging Act' (1 U.S. Code Congressional and Administrative News, p. 2101) declares that: '(1) The number of persons forty-five years of age and older in our population has increased from approximately thirteen and one-half million in 1900 to forty-nine and one-half million in 1957, and the number sixty-five years of age and over from approximately three million in 1900 to almost fifteen million at the present time, and is expected to reach twenty-one million by 1975.' Page 2102: (5) [T]he lack of suitable facilities and opportunities in which middle-aged persons can learn how to prepare for the later years of life, learn new vocational skills, and develop and pursue avocational and recreational interests is driving many of our older persons into retirement shock, premature physical and mental deterioration, and loneliness and isolation and is filling up our mental institutions and general hospitals and causing an unnecessary drain on our health manpower. . . .

" '(7) [W]e may expect average length of life and the number of older people to increase still further, we must proceed with all possible speed to correct these conditions and to create a social, economic, and health climate which will permit our middle-aged and older people to continue to lead proud and independent lives which will restore and rehabilitate many of them to useful and dignified positions among their neighbors; which will enhance the vigor and vitality of the communities and of our total economy; and which will prevent further aggravation of their problems with resulting increased social, financial, and medical burdens.' "

■ *Lundberg* v. *County of Alameda, supra,* 46 Cal.2d 644, 649: "The term charity has been defined in a number of California cases as 'a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons —either by bringing their hearts under the influence of education, or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings

or works, or otherwise lessening the burdens of government.' "
At page 650: "The argument made by plaintiff that the word
charitable should be narrowly construed in favor of taxability
has been rejected by this court in two recent cases involving
section 1c of article XIII."

When the words "educational, scientific or literary
purposes" are considered separately, sound basis appears for
treating them as charitable within the meaning of the Consti-
tution.

Educational gifts are said, in *Estate of Henderson, supra,*
17 Cal.2d 853, at p. 858, to be "clearly charitable." The
authorities cited in the last quotation from that case clearly
support the text.

Section 370 of Restatement Second of Trusts, says (p. 251):
*"A trust for the advancement of education is charitable. . . .*

*"a. Methods of advancing education.* Trusts for the
promotion of education include trusts to establish or main-
tain schools, colleges or other educational institutions; to es-
tablish professorships; to pay or to increase the salaries of
professors or to provide pensions for professors; to establish
scholarships or otherwise to assist students in acquiring edu-
cation; to establish or maintain public libraries, art museums
or other museums; to promote the advancement of knowledge
by research; to promote the dissemination of knowledge or of
beliefs by the publication of books and pamphlets or the de-
livery of lectures.

*"b. General trust to promote education.* A trust for the
promotion of education generally, without specifying the
method to be employed, is valid. Thus, a trust 'for the pro-
motion of education' or 'for educational purposes' is charit-
able. . . ." To the same effect see, *House of Rest* v. *County
of Los Angeles,* 151 Cal.App.2d 523, 530-531, 534 [312 P.2d
392]; *Estate of Bailey,* 19 Cal.App.2d 135, 140 [65 P.2d 102];
*Estate of Bartlett,* 122 Cal.App. 375, 376 [10 P.2d 216].

Indeed, respondent's brief, commenting upon the *Lundberg*
decision, concedes that "[t]he effect of the court's decision is
that if an educational use is so limited that it is also a char-
itable use there is a constitutional basis for exemption."

*Goodwill Industries* v. *County of Los Angeles,* 117 Cal.
App.2d 19 [254 P.2d 877], is distinguishable. The court,
after analyzing the articles of incorporation, said at page 24:
"The plain meaning of this language makes it clear that plain-
tiff could, in the tax year here involved, or at any later pe-

riod, without violating its charter, *build, equip,* and *operate* schools of less than collegiate grade, such as, for example, trade schools, and could devote all of the property upon which it presently seeks exemption to any or all of such purposes. This would be contrary to the express provisions of section 214, Revenue and Taxation Code, and the principles enunciated in the *Pasadena Hospital* case and the holding in *Moody Institute of Science* v. *County of Los Angeles, supra* [105 Cal.App.2d 107 (233 P.2d 51)].'' The opinion also observes: ''As in the *Moody Institute* case, there is nothing in plaintiff's articles of incorporation which in any way limits or restricts its nonexempt purposes (e.g., educational powers) or subordinates them to the status of powers which are merely incidental to a program of charitable rehabilitation of the handicapped or aged. Plaintiff's alleged intent to employ its nonexempt powers in such a restricted manner does not cure this deficiency in its articles of incorporation.'' (Pp. 24-25.) Concerning this matter we will have more to say presently. This case, along with *Pasadena Hospital Assn.* v. *County of Los Angeles,* 35 Cal.2d 779 [221 P.2d 62], and *Moody Institute of Science* v. *County of Los Angeles,* 105 Cal.App.2d 107 [233 P.2d 51], was distinguished as follows in *Pacific Home* v. *County of Los Angeles,* 41 Cal.2d 844, 853 [264 P.2d 539]: ''The above-cited *Pasadena Hospital, Moody Institute,* and *Goodwill Industries* cases are clearly distinguishable. In each of those instances the recipient corporation was organized and operated for both exempt and nonexempt purposes, and the property in question was acquired without any dedication to any one of its several purposes, exempt or nonexempt. Consequently, though the property in fact may have been used for exempt purposes at the time that the welfare exemption was sought, it could not be said that it had been irrevocably dedicated to exempt purposes when the corporate powers and purposes of the claimant corporation permitted it to divert the property or its proceeds to nonexempt purposes. The various broadly stated purposes, exempt and nonexempt, of the respective recipient corporations at the time of acquisition of the property prevented the imposition of a trust on the property for hospital (Pasadena Hospital Assn.), religious (Moody Institute), or charitable (Goodwill Industries) purposes. But here when plaintiff acquired the properties in question, its purposes as declared in its articles of incorporation were limited solely to exempt charitable purposes.''

*Moody Institute of Science* v. *County of Los Angeles, supra,* was decided before the 1951 amendment to the last (unnumbered) paragraph of section 214,[4] and proceeds upon the premise that "[p]roperty devoted to educational purposes is not exempt from taxation." (P. 109.) In addition to what is said upon this matter in *Pacific Home* v. *County of Los Angeles, supra,* it is to be noted that Mr. Presiding Justice White dissented and pointed out, at page 111, that "it seems apparent and manifest that the exemption of property used exclusively for 'religious . . . purposes' should be held to include any purposes which are incidental to and reasonably necessary for the accomplishment of religious purposes." And at pages 112-113, he said: "I am not unmindful of section 214(7) of the act, which provides that 'This section shall not be construed to enlarge the college exemption or to extend an exemption to property held by or used as an educational institution of less than collegiate grade'; but this section plaintly has reference to secular and not religious education. How would it be possible to disseminate a study of religion other than by the process of education? To hold otherwise would be to prohibit exemption of a religious institution maintaining Bible classes for education in religion. Plaintiff's articles of incorporation plainly irrevocably dedicate its properties to the teaching of a philosophy of religion—of man's utter dependability upon Almighty God in whatever achievements he may attain in the field of science. Whatever educational activities plaintiff may engage in under its articles of incorporation are solely and absolutely incidental to its religious purposes. If preparation and presentation 'of the facts and teachings of the Bible as an alternative to Godless materialism' does not constitute an irrevocable dedication to religious purposes, it would be difficult indeed to conceive of a dedication that could be characterized as religious.

"As I read the case of *Pasadena Hospital Assn.* v. *County of Los Angeles,* 35 Cal.2d 779 [221 P.2d 62], relied upon in the prevailing opinion, I am persuaded that it is not controlling here. In the case just cited, the articles of incorporation stated the objects and purposes to be not only the establishment and maintenance of a hospital but 'any other lawful

---

[4]Prior to that amendment that paragraph provided: ". . . This section shall not be construed to enlarge the college exemption *or to extend an exemption to property held by or used as an educational institution of less than collegiate grade.*" The 1951 amendment deleted the words we have italicized.

purpose where pecuniary profit is not the object thereof,' thereby permitting the property to be used for 'lawful purposes' other than 'hospital purposes'; while in the case now under consideration, plaintiff's articles of incorporation permit the use of its property for 'educational purposes' only insofar as such educational activities refer and are incidental to the promulgation of its 'religious purposes.' "

In the light of later decisions of the Supreme Court it now appears that Mr. Justice White's expressed views were and are sound. This matter of incidental uses is one of importance to which we will direct our attention later.

The word "scientific" is used several times in section 214 though the word "literary" does not appear therein. Because of the bearing upon the intrinsically benevolent nature of literary and scientific activities when pursued in connection with a church, hospital or home for the aged, the legislative approach to other charitable exemptions is persuasive. *Scripps etc. Hospital* v. *California Emp. Com.*, 24 Cal.2d 669 [151 P.2d 109, 155 A.L.R. 160], dealt with exemption from assessments under the Unemployment Insurance Act, section 7(g) thereof (now section 634 of Unemployment Insurance Code). The exemption then as now runs in favor of organizations engaged in "religious, charitable, scientific, literary or educational purposes." The court said, at page 677: "The language used in section 7(g) is practically identical with that used in similar sections of the federal legislation and in that of many states, and is precisely similar to the language used in other federal statutes which have been in effect for many years. For that reason the interpretation placed upon that language by federal and other courts is unusually persuasive here. (*Union Oil Associates* v. *Johnson*, 2 Cal.2d 727 [43 P.2d 291].)"

The Bank and Corporations Tax Law (Rev. & Tax. Code, § 23701d, which was added in 1949) exempts from the tax: "Corporations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation." Both these statutes stand as legislative expression of the concept "charitable" as including scientific and literary activities.

84 Corpus Juris Secundum section 299, page 623: *"Literary and scientific societies or property held and used exclusively for scientific or literary purposes may be exempted from taxation.*

"Literary and scientific societies may be exempted from taxation under provisions of the exemption laws dealing expressly with such institutions, under constitutions or statutes exempting charitable institutions, or under statutes exempting from taxation property held and used exclusively for scientific or literary purposes. . . ." At page 624: *"Literary or scientific character.* Under statutes expressly exempting property of literary and scientific societies or institutions, exemption has been granted to an educational institution, to an association incorporated to conduct an agricultural fair, and to a woman's club, and denied to a theosophical corporation and to a corporation of metaphysicians."

*Id.* section 298, page 622: *"Free public libraries and museums are usually exempted from taxation.* Free public libraries and museums are usually exempted from taxation, either under a designation specially appropriate to such institutions, or in the character of educational or of charitable and benevolent institutions. . . ."

2 Restatement Second of Trusts, section 372, page 255: *"A trust for the promotion of health is charitable. Comment: a. Scope of the rule.* A trust for the prevention or cure or treatment of diseases or otherwise for the promotion of health is charitable. Thus, a trust to establish or maintain a hospital, or to maintain a ward or a bed in a hospital, or a trust for the study of the causes or cure or treatment of diseases, or a trust to maintain conditions conducive to health, as by draining swamps, disposing of sewage, establishing pest houses, or otherwise preventing the spread of disease, is charitable.

"A trust for the promotion of mental health is charitable. Thus, a trust to provide a home of rest for persons who have overworked or who are otherwise in need of mental relaxation is charitable."

*People* v. *Cogswell,* 113 Cal. 129, 138 [45 P. 270, 35 L.R.A. 269]: "The objects and purposes of the present trust are purely charitable. The mode of effectuating the charity by the erection and maintenance of a polytechnic college is clearly set forth." At page 139: "All goes to the spread of technical knowledge, and to the gratuitous instruction in the

mechanical arts of the boys and girls of the state. Such a trust is in conformity with the act of 1885, and that act in no way contravenes the provisions of section 9, article XX, of our constitution.''

In *Board of Assessors* v. *Garland School of Home Making,* 296 Mass. 378 [6 N.E.2d 374], it appeared that the statute exempted ''property of literary, benevolent, charitable and scientific institutions.'' The court said, at page 386: ''The statute does not in terms exempt educational institutions, though 'educational' purposes are named specifically among the purposes for which income or profits of an institution within the exempted class may be used or appropriated without loss of the exemption. It is, however, settled that educational institutions of a public charitable nature are within the class of 'literary, benevolent, charitable and scientific institutions' which are exempt from taxation even if the education given is not strictly 'literary' or 'scientific' within the ordinary meaning of these words. [Citations.]''

It thus appears, we think, that the words ''educational, scientific or literary,'' whether construed distributively or collectively, lend themselves readily to the settled concept of a charity and their inclusion in appellant's statement of corporate purposes does not spell absence of a charity. True, any one of these activities may be exercised on a wholly mercenary basis and when that is done the property so used is not exempt from taxation. ▇ But the question now before us is whether those terms necessarily connote absence of a benevolence. We are satisfied that they do not, for any of them may be ''incidental to and reasonably necessary'' for the accomplishment of the primary charitable purpose of the taxpayer, and all property held by a benevolent corporation is impressed with the charitable trust. (*Pacific Home* v. *County of Los Angeles, supra,* 41 Cal.2d 844, 852-853.) This being so, the presumption follows that it will be so used. Not until the charitable aspect of the particular activity is undiscernible does the presence of the particular purpose interfere with the tax exemption. ▇ As was said in *House of Rest* v. *County of Los Angeles, supra,* 151 Cal.App.2d 523, 532-533: ''The test for determining whether the property is used exclusively for religious or charitable purposes is not whether such property is 'essential, indispensable and necessary' for the accomplishment of such purposes, as argued by defendants, but whether the use is 'incidental to and reason-

ably necessary' for the accomplishment of such purposes. 'To this point it would appear that the exemption of property "used exclusively for religious . . . or charitable purposes" should be held to include any property of the religious or charitable entity which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of religious or charitable purposes. The integrated activities as a whole must be examined in determining the tax status of property for the welfare exemption.' (*Serra Retreat* v. *County of Los Angeles*, 35 Cal.2d 755, 758 [221 P.2d 59].)'' This is a well-settled principle which is stated in numerous cases, including *Cedars of Lebanon Hospital* v. *County of Los Angeles*, 35 Cal.2d 729, 736 [221 P.2d 31, 15 A.L.R.2d 1045]; *St. Francis Memorial Hospital* v. *City & County of San Francisco*, 137 Cal.App.2d 321, 327-328 [290 P.2d 275]; the dissent of Mr. Presiding Justice White in *Moody Institute of Science* v. *County of Los Angeles, supra,* 105 Cal.App.2d 107, 111. In the *Cedars* case, *supra,* the court, speaking of recreational facilities of a hospital, said at page 736: ''It thus appears that under the rule of strict but reasonable construction, the phrase 'property used exclusively for . . . hospital . . . purposes' should be held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of hospital purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern hospital.'' At pages 744-745: ''But these considerations have no force here under the facts presented and the test above set forth, as such use of the property was for a facility which was incidental to and reasonably necessary for the accomplishment of hospital purposes, regardless of whether it was used to meet the recreational needs of patients or of essential personnel, or both. In other words, the tennis court was reasonably necessary for the fulfillment of a generally recognized function of a complete, modern hospital. Perhaps it may not be said that such recreational facility, in its use by either patients or essential personnel, is indispensable to the accomplishment of hospital purposes; but absolute indispensability does not commend itself as an appropriate test, and it finds no support in the authorities. Accordingly, we conclude that the trial court erred in denying the exemption claim with respect to the tennis court as a reasonable recreational facility on the hospital grounds.''

In construing the articles of incorporation the "integrated activities as a whole must be examined in determining the tax status of property for the welfare exemption." (*Serra Retreat* v. *County of Los Angeles*, 35 Cal. 2d 755, 758 [221 P.2d 59]; *House of Rest* v. *County of Los Angeles, supra,* 151 Cal.App.2d 523, 533.) In so doing the court must consider whether there is anything in the articles restricting purposes which are prima facie nonexempt or subordinating them to the status of powers which are merely incidental to a program of charitable rehabilitation of the handicapped or aged (paraphrasing the language of this court at the bottom of page 24 of 117 Cal.App.2d, in *Goodwill Industries* v. *County of Los Angeles, supra.* In that case the court found that there was nothing of a restrictive or subordinating character. Here the reverse is the case.

Article II, subdivision (c) of the corporate charter (the one containing the words educational, scientific or literary) expressly limits the use of funds or property for such purposes "to the extent that such application is in the judgment of the Board of Trustees consistent with the then existing obligation to provide for persons under the care of the corporation"; and subdivision (d) adds: "To carry out all of the foregoing purposes in such manner as to promote the cause of Jesus Christ and His Kingdom." Furthermore, article IV concludes as follows: "Any business activities authorized or permitted hereunder shall never become the primary or principal purpose of the corporation but shall be engaged in only as an incident of and subject to the primary non-profit purposes hereinabove expressed." Clearly, educational, scientific and literary purposes are to be pursued only so far and in such manner as the board of trustees may deem them in furtherance of the primary purpose expressed in subdivision (a): "To furnish food, lodging and medical care to elderly persons and to otherwise fulfill their wants and needs and provide for their life care." In this connection see *Solheim Lutheran Home* v. *County of Los Angeles*, 152 Cal.App.2d 775, 778 [313 P.2d 185].

In the event that any of these incidental or subordinate purposes are prostituted to mercenary ends the Attorney General has a right and duty to exercise his supervisory power over charities and to correct the situation. (*Solheim Lutheran Home* v. *County of Los Angeles, supra,* 152 Cal.App.2d 775, 779; *House of Rest* v. *Los Angeles, supra,*

151 Cal.App.2d 523, 529; *Pacific Home* v. *County of Los Angeles, supra,* 41 Cal.2d 844, 854; *People* v. *Cogswell, supra,* 113 Cal. 129, 136.)

Finally, it should be said that the instant record shows that none of plaintiff's property was actually used for a nonexempt purpose; if it had been, the result would be denial of the exemption as to the property so used but not as to the balance of the corporation's property which was employed for the purpose to which dedicated. See *St. Francis Memorial Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 326-327; *Pasadena Hospital Assn.* v. *County of Los Angeles, supra,* 35 Cal.2d 779, 785.

We conclude that the articles of incorporation of appellant cannot be condemned on the ground of nonexempt purposes, that there was no need to amend them in 1959, and that plaintiff was entitled to the welfare exemption for the years in question had it properly pursued its claim therefor.

We also find that section 268, Revenue and Taxation Code, is not the panacea which appellant claims for it. Construed as its counsel would have us do, it would put an end to all procedural requirements for claiming and enforcing the welfare exemption, would attribute to it automatic action and enable the taxpayer to recover the amount of the exemption for any of the years 1954-1961, inclusive, without any preliminary showing of facts affording a right thereto, without any claim for refund, and through suit instituted at any time suitable to the claimant's convenience regardless of any statute of limitation. We cannot subscribe to that doctrine for the reason, among others, that the court in *Doctors General Hospital* v. *County of Santa Clara,* 188 Cal.App.2d 280, 285 [10 Cal.Rptr. 423] (discussing Rev. and Tax. Code, § 263, which is almost the exact counterpart of § 268 except that it relates only to hospitals), pointed out that "[i]n section 263, the Legislature has made no attempt to change, add to, or lessen any of the qualifications provided by the Constitution for exemption by a hospital. It has merely provided that a hospital otherwise qualified for the exemption may be entitled to it without having previously complied with *a certain procedural step.*" (Italics added.)

The background of section 268, first enacted in 1957, is helpful to its proper interpretation. Section 214, Revenue and Taxation Code sets forth the main qualifications of a

corporation which would claim the welfare exemption. Sections 254 and 254.5 provide that a return, accompanied by affidavits and financial statements of the owner and operator, shall be filed in duplicate before the first day of April, copy of same transmitted by the assessor to the Board of Equalization for its audit and other verification, same to be followed by transmission of its finding to the assessor, which finding ''shall be considered by the assessor in his determination with respect to the claim for exemption.'' Section 260: ''If any person, claiming any exemption named in this article, fails to follow the required procedure, the exemption is waived by the person.''

Section 268 was enacted as chapter 2015 of the 1957 statutes and then read: ''Any tax or penalty or interest thereon for any fiscal year commencing during the calendar year 1954, 1955 or 1956 on property as to which the welfare exemption was available for such fiscal year shall be canceled pursuant to Article 1 (commencing with Section 4986) of Chapter 4 of Part 9 of this division as if it had been levied or charged erroneously, and, if paid, a refund thereof shall be made pursuant to Article 1 (commencing with Section 5096) of Chapter 5 of Part 9 of this division as if it had been erroneously collected.

''No amount shall be canceled or refunded pursuant to this section unless the person or organization otherwise entitled to such cancellation or refund has first complied with the provisions of Section 32 of this code, relating to the loyalty declaration.''

At each successive session of the Legislature the section has been amended to include the calendar year or years just elapsed and by 1961 it expressly covered calendar years 1954, 1955, 1956, 1957, 1958, 1959, 1960 and 1961. No other changes were made in the section except that the 1959 amendment eliminated its second paragraph and substituted an urgency clause reading: ''Sec. 2. This act is an urgency measure necessary for the immediate preservation of the public peace, health or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting such necessity are:

''Some persons and organizations have inadvertently failed to file the required affidavit in support of the tax exemption of their property which is granted by the State Constitution, and as a result now are confronted with obligations which, if met,

will substantially impair their ability to function effectively. This act will remedy the situation by, in effect, removing the procedural bar to the application of the exemption to such property. In doing so, the public policy of the State as expressed in the Constitution will be entirely fulfilled and the State as a whole will benefit.'' (Stats. 1959, ch. 102, p. 1955.)

Each later amendment has carried this same clause. On its face this language lifts the waiver flowing from failure to file the affidavit required by sections 254 and 254.5—''will remedy the situation by, in effect, removing *the procedural bar* to the application of the exemption to such property.'' (Italics added.) Section 268 conforms to this expressed view for it provides for cancellation ''pursuant to Article 1 (commencing with Section 4986) of Chapter 4 of Part 9 of this division as if it had been levied or charged erroneously,''[5] or a refund ''pursuant to Article 1 (commencing with Section 5096) of Chapter 5 of Part 9 of this division as if it had been erroneously collected.''[6] The phrase ''pursuant to'' means in ordinary connotation ''in conformity with.'' (*Fabianich* v. *Hart* (D.C.) 31 A.2d 881, 883; *State* ex rel. *Ickes* v. *Slinger*, 79 Ohio App. 334 [73 N.E.2d 385, 387]; *Hawkeye Casualty Co.* v. *Halferty* (8th Cir. 1942) 131 F.2d 294, 298; *First-Central Trust Co.* v. *Claflin*, 49 Ohio L.Abs. 29 [73 N.E.2d 338, 399].)

Section 4986 (a part of ch. 4) covers cancellation of taxes ''erroneously or illegally'' levied or charged, and specifies that it may be done ''on satisfactory proof.'' Section 4987 says: ''No cancellation shall be made of charges on tax exempt property if there has not been compliance with the statutory procedure for claiming the exemption''; in the light of section 268 this must mean compliance with the procedure in other respects than filing of the affidavit and accompanying claim.

Section 5096 authorizes refund of taxes which have been paid as if they were erroneously or illegally collected. Section 5096.5 says that taxes embraced within a retroactive constitutional amendment ''shall be refunded after compliance with the provisions of this article, except that the claim for refund may be filed at any time within three years after the date such amendment became effective, or the date that this section became effective, whichever is later.''

---

[5] Said article 1 of chapter 4 embraces sections 4986-4994.
[6] Article 1 of chapter 5 comprises sections 5096-5107.

Section 5097: ''No order for a refund under this article shall be made except on a claim: (a) Verified by the person who paid the tax, his guardian, executor or administrator. (b) Filed within three years after making of the payment sought to be refunded.''

Section 5103 says that in case of rejection of a claim for refund the claimant may commence an action to recover the taxes ''within six months after such rejection.''

Section 5104: ''No action shall be commenced or maintained under this article unless a claim for refund shall have been filed in compliance with the provisions of this article, and no recovery of taxes shall be allowed in any such action upon a ground not asserted in the claim for refund.''

The plain meaning of these statutory provisions appears to be that, while there is no time limit upon the right to cancellation (so conceded at page 24 of respondent's brief), a refund can be had only after presentation of a proper claim showing a right thereto which must be filed within three years after payment of the sum sought to be refunded and subject to the further condition that suit must be brought, if at all, within six months after such rejection. This view is fortified by the language of section 271 which pertains to ''property owned by any organization qualified for the welfare exemption pursuant to Section 214 which was acquired by it during that calendar year after the lien date in that year but prior to the commencement of such fiscal year.'' After making provisions substantially the same as section 268, it contains this concluding sentence: ''Any cancellation or refund made pursuant to this section shall be made notwithstanding any limitation upon the time within which such cancellation or refund could otherwise be made.'' The contrast between these two sections in this regard is significant. We know not the reason for the difference but the absence from section 268 of this last quoted sentence of section 271 emphasizes the fact that section 268 does not do away with time limitations.

To hold that section 268 means anything else would relieve the claimant (the charitable corporation) of any duty to make a showing of a right to refund or to do so within the reasonable period of three years after payment of the tax. We cannot subscribe to that doctrine as representing the legislative intention expressed in section 268. █ On the contrary, we deem the interpretation above outlined to be dictated by the settled rules thus stated in 45 California Jurisprudence

2d section 116, page 625: "Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity. Thus, where a statute is susceptible of two constructions, the one that leads to the more reasonable result will be followed. A literal construction that will lead to absurd results should not be given if it can be avoided." See also *In re Alpine,* 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; *Chavez* v. *Sargent,* 52 Cal.2d 162, 203 [339 P.2d 801].

 Application of the stated principles to the amended complaint at bar results in the following conclusions.

Count first seeks recovery of the second installment of 1957-1958 taxes which was paid on May 7, 1958. Claim for refund was filed with the Board of Supervisors on April 10, 1961, and denied July 25, 1961. It is stipulated by counsel that the original complaint in this action was filed on November 10, 1961. The claim was filed within the prescribed three years after payment and suit was commenced within six months after rejection of the claim. The claim was not accompanied by the affidavit required by § 254.5, Revenue & Taxation Code; but this first claim does not fail because of absence of such affidavit; the time limitations here applicable refer to the claim for refund and a suit based thereon; presence or absence of such an affidavit in connection with the claim goes to the weight of its showing and is a matter for consideration by the assessor and the board of equalization.

A second claim for the same refund (and additional amounts) was filed on December 28, 1961 and denied January 15, 1962. This claim was filed too late for the tax was paid on May 7, 1958 and the claim filed more than three years later; with respect to this claim Count I was vulnerable to the general demurrer, but its allegations concerning the first claim are sufficient and the demurrer was erroneously sustained to the first count.

Count sixth. Taxes for 1955-1956 paid on December 12, 1955, and April 10, 1956; claim for refund filed December 28, 1961, more than three years after payment. No cause of action shown by this count.

Count seventh. Taxes for 1956-1957 paid on December 8, 1956, and April 10, 1957; claim for refund filed December 28,

1961, more than three years after payment. No cause of action stated.

Count eighth. First installment of taxes for 1957-1958 paid December 9, 1957; claim for refund filed December 28, 1961, too late. No cause of action.

Count second alleges filing of exemption claim and adequate supporting affidavit, but exemption denied upon 1958-1959 taxes, which were paid on December 8, 1958, and April 9, 1959. The filing of claim for refund on April 10, 1961, was timely; the claim was denied on July 25, 1961. Suit filed on November 10, 1961, was timely.

Counts third, fourth, and fifth were filed too late but respondent has not raised the point that the action comes too late with respect to these counts and therefore has waived the same. Respondent's attack upon them is based upon the alleged failure of Samarkand to dedicate its property irrevocably to charitable uses,—this because of its inclusion in its articles of the words "educational, scientific and literary." Our discussion of this point establishes that it constitutes no defense to the complaint.

The demurrer was properly sustained as to counts sixth, seventh and eighth, but erroneously sustained as to the other counts of the amended complaint. Judgment is reversed with instructions to the lower court to take such further steps as may be not inconsistent with the views hereinbefore expressed.

Fox, P. J., and Herndon, J., concurred.

Respondent's petition for a rehearing and appellant's request for a modification of the opinion were denied June 14, 1963. Respondent's petition for a hearing by the Supreme Court was denied July 17, 1963.