[No. AO15543. First Dist., Div. Two. Aug. 26, 1983.]

FRED W. ARMSTRONG, Plaintiff and Respondent, v.
COUNTY OF SAN MATEO et al., Defendants and Appellants.

ROBERT E. BARRETT et al., Plaintiffs and Respondents, v.
COUNTY OF SANTA CLARA et al., Defendants and Appellants.

598

602

COUNSEL

John K. Van de Kamp, Attorney General, Timothy G. Laddish, Deputy Attorney General, Donald L. Clark, County Counsel, Byron D. Athan and Thomas W. Cain, Deputy County Counsel, James P. Fox, District Attorney, and David L. Martin, Deputy District Attorney, for Defendants and Appellants.

Donald L. Clark, County Counsel (San Diego), Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Bruce W. Beach, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

Howard S. Burnside, H. Steven Burnside and Burnside & Burnside for Plaintiffs and Respondents.

OPINION

**KLINE, P. J.**—This is a taxpayer challenge to the legislative and administrative interpretation of the 2 percent inflation factor provision of article XIII A, section 2, subdivision (b), of the California Constitution, which may be applied each year to increase the taxable value of real property in California.

Article XIII A, which is set forth in the appendix hereto, was enacted as a property tax reform and limitation initiative, commonly known as Proposition 13, that was adopted by the voters on June 6, 1978, and became effective on July 1, 1978.[1] The taxable value of real property is referred to in the article as "full cash value," which is defined in section 2, subdivision (a), as "the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment." Section 2, subdivision (b), limits annual increases in the full cash value by providing that "[t]he full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year . . ." (hereinafter sometimes referred to as the inflation factor).

The State Board of Equalization (Board) and thereafter the Legislature each independently interpreted section 2, subdivision (b), to permit the 1978-1979 tax year assessment of property that had not been newly con-

---

[1]Section 5 provides that, "This article shall take effect for the tax year beginning on July 1 following the passage of the Amendment, except Section 3 which shall become effective upon the passage of this article."

structed or experienced a change of ownership since 1975 by taking the full cash value of property as it appeared on the 1975 roll as increased by 2 percent per year compounded for each of the three years between 1975 and 1978. In other words, the Legislature and the Board authorized the 1978-1979 assessment of property at a figure 6.12 percent higher than the full cash value designated in the 1975-1976 tax bill. Respondent taxpayers challenged this interpretation in separate but consolidated actions seeking tax refunds and other relief. The trial court declared that the legislative and administrative interpretation of section 2, subdivision (b), permitting adjustment for the three tax years immediately preceding the effective date of the article, is contrary to its plain meaning and thus represents an invalid attempt to amend a constitutional provision. For the reasons hereafter set forth, we find, *first,* that the constitutional provisions are intrinsically ambiguous as to when application of the inflation factor commences; *second,* that the effects of the legislative interpretation are not manifestly inimical to the constitutional design; *third,* that the uncertain language of the constitution is not clarified by extrinsic evidence of the intent of the voters; and, *fourth,* that in these circumstances the applicable canons of construction compel us to defer to the legislative interpretation. Accordingly, we reverse.

I.

The major conceptual change effectuated by article XIII A, which results from section 2, subdivision (a), is that "except for property acquired prior to 1975, henceforth all real property will be assessed and taxed at its value *at date of acquisition* rather than at current value (subject, of course, to the 2 percent maximum annual inflationary increase provided for in subdivision (b))." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 235 [149 Cal.Rptr. 239, 583 P.2d 1281]). Additionally, the article alters the basic system of ad valorem property taxation in two main respects. The first section restricts the amount of ad valorem taxes to one percent of the full cash value of property.[2] The second section restricts increases in the full cash value base to an inflation factor not to exceed 2 percent per year and allows reductions in full cash value if the property has been damaged or destroyed or has otherwise declined in value.[3] In other words, the first section limits the ability of local

---

[2]Section 1, subdivision (a), provides in part that "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property."

[3]Section 2, subdivision (b), was amended by the voters by the passage of Proposition 8 on the November 7, 1978, ballot, which amendment has been held retroactive to the effective date of article XIII A. (*State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 825 [164 Cal.Rptr. 739].) As so amended, section 2, subdivision (b) now provides that "The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price

governments to tax full cash value while the second section, which is at issue here, limits the growth in full cash value.

On June 8, 1978, two days after the election, the Board issued an analysis of Proposition 13 to county assessors in order to clarify ambiguous portions of the initiative. The Board advised assessors that "[w]hen preparing the 1978-79 assessment, the assessor *will add* 2 percent to the 1975-76 value base for each of the lien dates 1976, 1977, and 1978." (Italics in original.)

On June 14, 1978, the Board instructed county tax assessors that the 1975-1976 full cash value base should be adjusted by 2 percent per year for each of the lien dates subsequent to 1975 in order to determine 1978 values. Rule 460 of the Board's rules (Cal. Admin. Code, tit. 18, § 460) embodies that concept.[4]

On June 15, 1978, the Board instructed county assessors that "[t]he 1975-76 base values are to be adjusted by 2 percent compounded for each of the three subsequent lien dates (1976, 1977, 1978) to determine 1978 values. This factor is 1.0612 [(1.02³)]."[5]

---

index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value." Also, "full cash value base" was substituted for "fair market value base" and the provision allowing reduction in full cash value was added.

[4]Rule 460, subdivision (a), states that: "Sections 1 and 2 of article XIII A of the Constitution provide for a limitation on property taxes and a procedure for establishing the current taxable value of locally assessed real property by reference to a base year full cash value which is then modified annually to reflect the inflation rate not to exceed two percent per year or declines in value from whatever cause."

Rule 460, subdivision (B)(5) provides, "For each lien date after the lien date in which the base year full value is determined, the full value of real property shall be modified to reflect the percentage change in cost of living, as defined in Section 2212 of the Revenue and Taxation Code; provided that such value shall not reflect an increase in excess of 2 percent of the taxable value of the preceding lien date."

[5]The Board issued this directive in the discharge of duties mandated by Government Code section 15606, which provides in material part as follows:
"The State Board of Equalization shall:
". . . . . . . . . . . . . . . . . .
"(c) Prescribe rules and regulations to govern local . . . assessors when assessing . . . .
"(d) Prescribe and enforce the use of all forms for the assessment of property for taxation . . . .
"(e) Prepare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation. . . .
". . . . . . . . . . . . . . . . . .
"(h) Bring an action in a court of competent jurisdiction to compel an assessor . . . to comply with any provision of law, or any rule or regulation of the board adopted in accordance with subdivision (c) of this section, governing the assessment or taxation of property. . . .
"The provisions of this section are mandatory."
As stated in subdivision (c) the rules and regulations of the Board "govern" the actions

On June 24, 1978, the Governor signed urgency legislation that went into immediate effect as Revenue and Taxation Code section 110.1. Section 110.1, subdivision (f), provides that: *"For each lien date after the lien date in which the full cash value is determined* pursuant to this section, the full cash value of real property, including possessory interests in real property, shall reflect the percentage change in cost of living, as defined in section 2212; provided, that such value shall not reflect an increase in excess of 2 percent of the full cash value of the preceding lien date." (Italics added.)

On July 10, 1979, the Governor signed another immediately effective urgency measure enacting Revenue and Taxation Code section 51.[6] This statute provides in pertinent part that: "For purposes of subdivision (b), of Section 2 of article XIII A of the California Constitution, *for each lien date after the lien date in which the base year value is determined* pursuant to section 110.1, the taxable value of real property shall be the lesser of: [¶] (a) Its base year value, compounded annually since the base year by an inflation factor, which shall be the percentage change in the cost of living, as defined in Section 2212; provided, that any percentage increase shall not exceed 2 percent of the prior year's value; . . ." (Italics added.)

Respondent taxpayers, asserting that the Board's rule and the two statutes just described are inconsistent with article XIII A, section 2, subdivision (b), filed suit against the Board and local taxing authorities seeking a refund of taxes, an injunction or writ of mandate directing the taxing authorities to utilize the unadjusted 1975-1976 full cash value base as the 1978-1979 full cash value and a declaration that the inflation factor shall only commence application thereafter.

The principal witnesses at trial were Howard Jarvis and Paul Gann, the drafters and principal proponents of Proposition 13. The essence of their testimony was that although the commencement date of the inflation factor

---

of local assessors. However, pursuant to Revenue and Taxation Code section 538, a local assessor who believes that a provision of the California Constitution, a California tax statute, or a rule or regulation of the Board is unconstitutional or invalid, "and as a result thereof concludes that property should be assessed in a manner contrary to such provision," shall bring an action for declaratory relief against the Board under section 1060 of the Code of Civil Procedure. No such action has been commenced by any local assessor with respect to the rule of the Board here challenged.

[6]Section 51 originated with the Task Force on Property Tax Administration formed by the Chairman of the Assembly Committee on Revenue and Taxation for the purpose of studying existing property tax statutes in light of Proposition 13 and to make recommendations as to appropriate changes. This Task Force, which described itself as "a group of knowledgeable individuals from a wide variety of interests and organizations" issued its final report in January, 1979 (*Report of the Task Force on Property Tax Administration to the Assembly Committee on Revenue and Taxation* (Jan. 22, 1979).) Revenue and Taxation Code section 51, subdivision (a), as signed into law by the Governor on July 10, 1979, is identical to the recommended statute set forth in this report. (*Id.,* p. 32.)

was never discussed by them or to their knowledge by anyone else during the election campaign, each contemplated that application of the inflation factor would not commence prior to the effective date of the amendment. As stated by Mr. Gann, "it just seemed natural to myself and to those that I worked with that it would become law and operative on July the 1st, 1978."

The trial court ruled in favor of respondents, finding that although the evidence produced by the parties provided little guidance, the language of the provision was clear that the inflation factor was not to be applied until after the effective date of article XIII A. Accordingly, the court declared the legislative and administrative application of section 2, subdivision (b), unconstitutional, and granted related relief.[7]

■ Ordinarily, "[r]ules of construction and interpretation that are applicable when considering statutes are equally applicable in interpreting constitutional provisions."[8] (*County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 979 [156 Cal.Rptr. 777].) ■ "The interpretation of a statute . . . is a question of law and we are not bound by evidence presented on the question in the trial court." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) Since this rule applies to interpretation of a constitutional amendment we thus proceed to analyze article XIII A, section 2, subdivision (b), as a matter of first impression, not bound by the trial court's interpretation.

## II.

■ Respondents preliminarily maintain that article XIII A is self-executing with respect to the inflation factor and therefore neither requires implementing legislation nor admits to any legislative interpretation. This argument is, however, premised on the false assumption that self-executing constitutional provisions are never subject to reasonable interpretation or clarification.

In *Chesney* v. *Byram* (1940) 15 Cal.2d 460, 462-463 [101 P.2d 1106], it was stated that a constitutional provision is self-executing "'if it supplies a

---

[7]Due to the result we reach, it is unnecessary to address the question whether the nature of the relief accorded exceeded the jurisdictional power of the trial court. Nor is it necessary for us to determine whether it was error for the trial court to declare in its judgment that respondents are entitled to an award of attorneys fees pursuant to Code of Civil Procedure section 1021.5 upon a proper posttrial motion.

[8]This does not mean, of course, that all rules of statutory construction apply *under all circumstances* to the interpretation of constitutional provisions, or that competing rules of construction are accorded equal weight. (See discussion, *infra,* at pp. 622-624.)

sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced.' [Citations.]" After holding that the constitutional provision involved in that case was self-executing; that is, that it required no legislative enactment to put it into effect, the court went on to point out that "it does not follow . . . that the legislature did not have the power to enact legislation providing reasonable regulation for the exercise of the right . . . ." (*Id.*, at p. 463.)[9]

Respondents' reliance on *Winchester* v. *Howard* (1902) 136 Cal. 432 [64 P. 692, 69 P. 77], and *Flood* v. *Riggs* (1978) 80 Cal.App.3d 138 [145 Cal.Rptr. 573], for the proposition that the Legislature may not interpret or implement a self-executing constitutional provision is misplaced. Those cases presented the question whether legislation was needed to *effectuate* the constitutional provisions in issue. In both cases it was held that such legislation was not required. (*Winchester, supra,* 136 Cal. at pp. 437, 441; *Flood, supra,* 80 Cal.App.3d at pp. 154-155.) However, this issue is distinct from the question presented here, which is whether legislation *may* be enacted to aid in the implementation of a constitutional provision. As stated in *Flood* v. *Riggs,* "[a]lthough a constitutional provision may be self-executing the Legislature may enact legislation to facilitate the exercise of the powers directly granted by the Constitution." (*Id.,* at p. 154.)

■ Appellants concede that article XIII A, section 2, subdivision (b), is self-executing, but contend it is ambiguous and thus amenable to and indeed in need of definitive legislative and administrative interpretation. In making this contention, appellants correctly point out that in upholding the validity of article XIII A as a whole, our Supreme Court recognized "that the article 'in a number of particulars is imprecise and ambiguous' and described it as 'a constitutional provision of a kind, similar to many others, which necessarily and over a period of time will require judicial, legislative, and administrative construction.' (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 244-245 . . . .)" (*County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 978.) The court in *Amador Valley* also recognized that "apparent ambiguities frequently may be resolved by the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment. [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* at p. 245.)

---

[9] A "self-executing constitutional provision" is defined in Black's Law Dictionary (5th ed. 1979) at page 1220, as "provisions which are immediately effective without the necessity of ancillary legislation. Constitutional provision is 'self-executing' if it supplies sufficient rule by which right given may be enjoyed or duty imposed enforced; constitutional provision is not 'self-executing' when it merely indicates principles without laying down rules giving them force of law."

In short, the validity of the challenged legislation and administrative rule depends not on whether article XIII A is self-executing, as it is, but on whether the legislation and the administrative rule are consistent with the constitutional provision they purport to implement.

## III.

■ The important threshold question is whether the meaning of the constitutional language in question is clear and plain or is ambiguous and uncertain.

For the most part, the parties address this question only indirectly. With a great deal of verbal table thumping they chiefly address their attention to the tax consequences of the competing interpretations, arguing that the results of the interpretation they respectively advance are more reasonable than those of the competing interpretation. These arguments rely heavily on extrinsic evidence and various rules of construction. We defer analysis of these contentions because they focus upon the interpretation rather than its subject and are therefore not germane to the limited preliminary question of ambiguity. The indicia of intent and rules of construction the parties variously rely upon are relevant, if at all, only after it is first determined that the meaning of the constitutional language that is the subject of interpretation is unclear. If the language is clear and its plain meaning discernible article XIII A must be held to mean what it clearly expresses, and it would then be relatively simple to determine which of the conflicting interpretations is in harmony and which is at war with the constitutional design. The extrinsic aids that the parties most heavily rely upon are ordinarily used to resolve ambiguity, not to determine whether it exists in the first place.

For this reason, and in order to clarify analysis, it is appropriate for us to emphasize that the clarity or ambiguity of section 2 of article XIII A is to be first determined by whether the meaning of any pertinent provision therein is contradicted by other language in the article or is otherwise unclear. The evidence that bears most forcefully upon this determination is, of course, the language in which the article is framed. ■ "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion." (*Caminetti* v. *United States* (1917) 242 U.S. 470, 485 [61 L.Ed. 442, 453, 37 S.Ct. 192]; see also the opinion of Chief Justice Marshall in *Sturges* v. *Crowninshield* (1819) 17 U.S. (4 Wheat.) 122, 202 [4 L.Ed. 529, 550].)

■ In analyzing the text of article XIII A, we must keep in mind that it was enacted as a whole and not in parts or sections. Accordingly, the words

and phrases of the article are not to be viewed in isolation; "instead, each is to be read in the context of the other provisions of the Constitution bearing on the same subject. [Citation.] The goal, of course, is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in so doing to give effect to the scheme as a whole. [Citations.]' " (*Kehrlein* v. *City of Oakland* (1981) 116 Cal.App.3d 332, 337 [172 Cal.Rptr. 111], quoting *Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729].)

■■■ The provisions of article XIII A that most obviously bear upon the time at which application of the inflation factor may commence are section 2, subdivision (a), which defines "full cash value" as the full valuation of real property as shown on the 1975-1976 tax bill; section 2, subdivision (b), which provides that "[t]he full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year . . . ."; and section 5 which, as pertinent, provides that the effective date of article XIII A is July 1, 1978.

By providing that full cash value may be altered to "reflect from year to year the inflationary rate, not to exceed two percent for any given year," there is no question that the section contemplates a limited annual adjustment of the full cash value base. It is similarly certain that the annual adjustment must commence with reference to some specific point in time. In relation to property acquired prior to 1975 that has not since been newly constructed nor changed hands, there are indisputably only two mutually exclusive possibilities: application may only commence *either* after establishment of the full cash value base in 1975 *or* after the 1978 effective date. Just as indisputably, however, the section does not explicitly identify which of the two possibilities is the correct reference point. Respondent taxpayers maintain that, although it may not have been made explicit, the necessary implication of the words used is that the adjustment commences in 1978 with the unadjusted full cash value specified in the 1975-1976 tax bill. Appellants, on the other hand, maintain that the words are at least equally susceptible to the inference that the adjustment may commence immediately after 1975; or, stated differently, that the full cash value base for the first lien date after the July 1, 1978, effective date is calculated by adjusting the 1975-1976 cash value base for each of the three intervening tax years.

In support of their position, respondents assert that sections 1 and 2 of article XIII A provide that the maximum amount of ad valorem tax on real property shall not exceed one percent of the full cash value as specified on the 1975-1976 tax bill. By adjusting the 1975-1976 full cash value for each of the next three tax years and compounding these adjustments, respondents charge that the Legislature and the Board created a commencement value of

real property (i.e., the taxable value of such property in 1978) which is 6.12 percent greater than the full cash value defined in section 2, subdivision (a). According to respondents, the Board achieved this result by acting upon the false assumption, embodied in rule 460, that "Sections 1 and 2 of article XIII A . . . provide . . . a procedure for establishing the current [i.e., 1978] taxable value of locally assessed real property by reference to a base year full cash value which is then modified annually to reflect the inflation rate not to exceed two percent per year." (Cal. Admin. Code, tit. 18, § 460, subd. (a).) Respondents insist that "Article XIII A contains limitations, definitions and commencement date. Article XIII A does not contain procedures."

Appellants just as vigorously assert the very opposite. The procedure they find in article XIII A is the provision in section 2, subdivision (b), that the "full cash value base may reflect *from year to year* the inflationary rate" (appellant's italics). Appellants emphasize that neither subdivision (b) nor any other provision of article XIII A identifies the referent of the first "year" of the authorized "year to year" adjustment of "the full cash value base." Nor does any provision of the article expressly delimit the scope of the phrase "for *any* given year" (italics added), which modifies the 2 percent limitation on the inflation factor and refers back to the "year to year" adjustment. For these reasons, among others, appellants find authority to conclude that application of the inflation factor may begin immediately after "the full cash value base" is established, which is in 1975.

The conflicting positions of the opposing parties also result from the different manner in which they connect the first two subdivisions of section 2 to section 1. Insofar as determining the commencement value of property is concerned, respondents read section 1 only in connection with section 2, subdivision (a). In this manner respondents find support for the inference that the maximum amount of ad valorem tax that may first be imposed is 1 percent of the amount shown on the 1975-1976 tax bill. Appellants, of course, take a more expansive view, reading section 1 in connection not only with subdivision (a) of section 2 but as well with subdivision (b) of that section. In this fashion they find a textual basis to conclude that the maximum tax that may first be imposed is 1 percent of the amount shown on the 1975-1976 tax bill adjusted for the three years intervening between the base year and the first tax year in the manner described in subdivision (b).

The structure of sections 1 and 2 and the first two subdivisions of the latter section does not clarify the definitional relationships that may exist between and among these various provisions with respect to the value of real property initially subject to tax under article XIII A. That is, there is

nothing in the structure of the provisions that either compels or prohibits the conclusion that subdivisions (a) and (b) of section 2 may both relate to the determination of full cash value in 1978. In light of the principle that the words of an instrument are to be applied to the subjects to which they appear by context most properly to relate and to which they are therefore really more applicable (see *Sargent* v. *Shumaker* (1924) 193 Cal. 122, 127 [223 P. 464]), respondents could more persuasively maintain that subdivision (b) of section 2 is not as definitionally relevant to the determination of commencement value as subdivision (a) if the latter provision had been incorporated into section 1 instead of section 2. But this is not the case. The location of both subdivisions in section 2, giving them equal sectional propinquity to section 1, while not conclusive, provides no warrant to assume that, for the purpose of determining the commencement value of property, one of said subdivisions has a definitional relationship to a phrase in section 1, while the other does not. By the same token, it would be easier for appellants to maintain that subdivisions (a) and (b) of section 2 apply equally to the initial determination of full cash value if the provisions separately set forth in each had been merged in a single subdivision. But this too is not the case.

Section 5 of article XIII A also does not shed much light on the proper reading of sections 1 and 2 with respect to determining the commencement value of property. As earlier noted, section 5 provides that, except for section 3, which is not here at issue,[10] the article "shall take effect for the tax year beginning on July 1 following the passage of this amendment [i.e., July 1, 1978]." Respondents maintain that application of the inflation factor prior to the 1978 effective date amounts to retroactive and double taxation. This contention is, however, clearly wrong. "A . . . retroactive statute is one that operates on matters that occurred, or on rights, obligations, and conditions that existed, before the time of its enactment, giving them an effect different from that which they had under previously existing law." (58 Cal.Jur.3d, Statutes, § 23, p. 335; see also 2 Sutherland Statutory Construction (4th ed.) § 41.02, pp. 247-249.) It is well settled that "[a] statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence before the enactment." (*Coast Bank* v. *Holmes* (1971) 19 Cal.App.3d 581, 593 [97 Cal.Rptr. 30].) Application of the inflation factor prior to the effective date of article XIII A does not give the

---

[10]Section 3 provides that: "From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales.or transaction taxes on the sales of real property may be imposed."

1975-1976 full cash value assessment or the pre-1978 adjustments thereof "an effect different from that which they had under previously existing law," such as, for example, by retroactively increasing taxes due in 1975-1976 or any other tax year prior to the effective date of the article. Rather, it merely utilizes facts existing prior to enactment of the article to determine tax rates to be applied *prospectively* from the effective date.[11] While such a provision is not commonly encountered in federal and state tax laws, neither is it unprecedented, as valid tax statutes do exist that determine a tax due for a current year by reference to events or conditions in previous years, including those prior to the year in which the statute was enacted or prior to the year in which the taxpayer became subject to tax.[12]

Our analysis of the words and structure of the text of article XIII A, insofar as said text relates to establishment of the commencement value of property, persuades us that the article is ambiguous and uncertain. The ambiguity results, first, from the absence of the referent of critical words in section 2, subdivision (b). But it is equally the result of the uncertainty whether subdivisions (a) and (b) of section 2 both define the meaning of

---

[11]Indeed, if we were to adopt respondents' erroneous theory of retroactivity we would be compelled to strike not only the statutes and administrative rule of which they complain, but as well one of the key provisions of article XIII A itself. For the requirement of section 2, subdivision (a), that tax rates subsequent to July 1, 1978, be determined (under certain circumstances) with reference to the full cash value determined in the 1975-1976 tax year is predicated upon a fact extant prior to the effective date of the article.

[12]Consider, for example, a provision of the revenue act of 1950 carried forward to the Internal Revenue Code of 1954 governing adjustments of the basis or tax cost of property to reflect depreciation, amortization, and depletion to the extent "allowed" or "allowable" (whichever is greater) as deductions in computing taxable income in a current tax year. Section 1016(a)(3)(B) provides that "Proper adjustment . . . shall . . . be made . . . in respect of any period . . . since February 28, 1913 [the date of enactment of the first revenue act after ratification of the 16th Amendment], during which such property was held by a person or an organization not subject to income taxation under this chapter or prior income tax laws." (26 U.S.C. § 1016(a)(3)(B).) This section, which applies to property owned by tax-exempt organizations and nonresident aliens and foreign entities during periods when they were not subject to United States taxation, will in a variety of situations require that a current tax be determined by reference to events occurring or conditions existing at times prior to enactment of the statute and prior to the time a taxpayer became subject to tax. Thus if X, an Italian, bought property in Rome in 1935 and in 1945 gave it to his son Y, also an Italian, who in 1982 took up residence in the United States and begins paying United States income tax, Y must report the rental income from the Italian property and may claim the operating expenses thereof, including depreciation. The basis on which such depreciation can be claimed is (1) the amount paid by X for the building in 1935 (the general rule under section 1015(a) is that the basis of property in the hands of a donee is the basis of the donor, adjusted as provided in section 1016 for periods prior to the gift); (2) less the depreciation on the building X could have claimed as deductions from 1935 until his gift to Y in 1945 had X then been a United States taxpayer; and (3) less the depreciation on the building Y could have claimed as deductions between 1945 and 1982 had he been a United States taxpayer during that period. (For other examples of conceptually similar federal tax provisions see Internal Revenue Code, §§ 316(a)(1) and 1015(c), 26 U.S.C. §§ 316(a)(1) and 1015(c).)

"full cash value" in the first tax year under article XIII A. While the language of the article does not expressly authorize the legislative and administrative interpretation that both subdivisions relate to this initial determination, neither does the language expressly prohibit such an interpretation.

In light of our conclusion that, literally and structurally, the text of the article can support both of the conflicting interpretations urged by the parties, we must next attempt to determine whether the interpretation adopted by the Legislature and the Board is in harmony with the central purpose of article XIII A.

## IV.

"It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result" (2A Sutherland Statutory Construction (4th ed.) § 45.12, p. 37, citing, inter alia, *People ex rel. S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790]; *People* v. *One 1962 Chevrolet Bel Air* (1967) 248 Cal.App.2d 725, 728 [56 Cal.Rptr. 878]; *Moeser* v. *County of San Diego* (1964) 227 Cal.App.2d 563, 564-565 [38 Cal.Rptr. 813]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1963) 223 Cal.App.2d 563, 569 [35 Cal.Rptr. 865]; and *Samarkand of Santa Barbara, Inc.* v. *County of Santa Barbara* (1963) 216 Cal.App.2d 341, 362 [31 Cal.Rptr. 151].)

Respondents contend that the interpretation of article XIII A adopted by the Legislature and the Board is unreasonable because a central purpose of the article is to limit taxes and the effect of the challenged statutes and administrative rule is to increase them.

This characterization of the statutes and rule is misleading; it is more accurate to say that they operate to diminish the extent of the tax decrease that otherwise would be enjoyed by some (but not all) taxpayers. For example, in the case of respondent Armstrong application of the inflation factor in 1976, 1977 and 1978 resulted in a 1978 tax that was $50.52 (or 6.12 percent) higher than it would have been if the inflation factor were not applied prior to 1978. However, though the figures are not contained in the record before us, there can be no doubt that respondents' 1978 property tax, like that of all California property taxpayers, was substantially lower than it would have been without the benefit of article XIII A.[13]

---

[13]If the full cash value base were determined by reference to a prior tax year materially earlier than 1975-1976, so that the result of applying the inflation factor prior to 1978 would be a commencement tax close to or greater than the tax that would have been due if article XIII A had not been enacted, then such result would certainly be unreasonable and fatally so.

Whether imposition of a commencement tax 6.12 percent higher than it would otherwise have been is reasonable in light of the purpose of article XIII A must be measured together with other results that concomitantly flow from application of the inflation factor prior to 1978. Such other results can be illustrated in several ways. One such illustration involves a comparison of property acquired in 1980 with that acquired in 1975. The property acquired in 1980 would be valued for 1982-1983 taxes by applying the inflation factor for each tax year since its 1980 acquisition. However, if the inflation factor were not applied until after 1978 the property acquired in 1975, like that acquired in 1976 or 1977, would be valued for 1982-1983 as if it only commenced inflating in 1978. Appellants claim that such disparate treatment would be unreasonable and unfair and "possibly unconstitutional." Although in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pages 232-236, the Supreme Court rejected a claim that article XIII A will result in invidious discrimination between owners of similarly situated properties, the comparison in *Amador Valley* was only between those who acquired property before and after 1975, that cutoff year being conceived of as serving the purpose of a grandfather clause. (*Id.,* at p. 235.) The disparate tax treatment resulting from respondent's interpretation of section 2, which unlike that dealt with in *Amador Valley* is not essential to the operation of the article, would exist even between property owners who, as in the above example, both acquired property on or after 1975. This post-1975 disparity was avoided by the Legislature and by the Board, which did so entirely within the conceptual framework provided by article XIII A.

A further pertinent consequence of the legislative and administrative interpretation of article XIII A pertains to those property owners whose property *declined* in value between 1975 and 1978. If, as respondents maintain, the inflation factor provision of section 2, subdivision (b), may not be applied until after 1978, it would then seem necessary to similarly defer application of the provision in the same subdivision authorizing a reduction in the full cash value base "to reflect substantial damage, destruction or other factors causing a decline in value." Thus, a 1975 purchaser whose property was substantially damaged by fire in 1977 would have his or her 1978-1979 taxes assessed on the basis of the unadjusted full cash value of the property in 1975-1976, without regard to the decline in value caused by the fire.

In short, the interpretation of article XIII A urged by respondents, which ignores decreases as well as increases in acquisition value during the three-year period between 1975 and 1978, would create disparities in tax treatment and other inequities that faithful adherence to the basic precepts of the article does not require. However, such disparities and inequities cannot be entirely eliminated without at the same time imposing a restriction upon the

full extent of the property tax decrease that article XIII A would otherwise provide for many taxpayers.

We are left with a legislative and administrative interpretation that has mixed results, as perhaps any interpretation, and certainly respondents', must also produce. Whether the burden of the interpretation adopted by the Legislature and the Board outweighs its benefits is a debatable issue on which reasonable minds can differ. What does seem to us clear, however, is that, taken as a whole, the results of the legislative and administrative interpretation are not productive of absurd consequences (see *Warner* v. *Kenny* (1946) 27 Cal.2d 627, 629 [165 P.2d 889], and *State Bd. of Equalization* v. *Board of Supervisors, supra,* 105 Cal.App.3d at p. 824) or so manifestly inconsonant with the purposes of article XIII A—which include tax reform as well as tax limitation—that the statutes and rule must be stricken for this reason.[14] In this case, as in others (see, e.g., *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 516 [35 Cal.Rptr. 480]), reasonableness is a matter of degree. Whether the practical consequences of the statute and rule are on balance sufficiently reasonable to survive the instant challenge will have to be determined by measuring the legislative and administrative interpretation against the intent of the voters or, if such intent cannot be discerned, by such presumptions or other guidelines as may be provided by the applicable rules of construction.

In light of this conclusion and our earlier determination that the text of article XIII A is intrinsically ambiguous, we next look to extrinsic evidence to determine, if we can, whether the legislative and administrative interpretation of article XIII A is consistent with the intent of the People by whose vote it was adopted.

### V.

 "A fundamental rule of construction of any legal document is that the main object of the interpretation is to ascertain the intent of the parties

---

[14]Accordingly, we reject respondents' contention that the statutes and administrative rule deprive them of substantive due process of law. Substantive due process essentially requires protection from arbitrary legislative action. Under this principle, a deprivation of property is justified "only if the conduct from which the deprivation flows is prescribed by reasonable legislation reasonably applied, i.e., the law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to the object sought to be obtained." (*Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].) In our view, the challenged statutes and administrative rule meet this test. Article I, section 15, of the California Constitution and predecessor provisions, providing that no person shall be deprived of property without due process of law, have been held to be identical in scope and purpose with the due process clause of the federal Constitution. (*Gray* v. *Whitmore, supra,* at p. 20.) On the application of the federal due process clause to tax statutes generally, see 1 Bittker, Federal Taxation of Income, Estates and Gifts, § 1.2.5, p. 1-26.)

who made the instrument and to give that intent the fullest effect possible consistent with the language of the provisions and the related body of law. . . . '[T]he courts must interpret a constitutional amendment to give effect to the intent of the voters adopting it' (*In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881]; *Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278])." (*State Bd. of Equalization* v. *Board of Supervisors, supra,* 105 Cal.App.3d at p. 821.)

It is appropriate to emphasize at this juncture that, as stated by the Supreme Court in a recent case interpreting other ambiguous provisions of article XIII A, "an after-the-fact declaration of intent by a drafter of Proposition 13 [Howard Jarvis] . . . may deserve some consideration (see *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372]); but by no means does it govern our determination how the *voters* understood the ambiguous provisions." (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, at p. 331, fn. 10 [182 Cal.Rptr. 506, 644 P.2d 192], italics added.)

As the Supreme Court noted in *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692 [170 Cal.Rptr. 817, 621 P.2d 856], a declaration by the author of legislation sent to the Governor, which outlined the intent of the Legislature and urged the Governor to sign it, was "not a proper subject for consideration in determining the Legislature's intent . . . ." (*Id.,* at p. 701.) The court held that the statement revealed only the author's personal opinion and understanding of the legislation. (*Ibid.*)

" 'In construing a statute we do not consider the motives or understandings of individual legislators who cast their votes in favor of it. [Citations.] Nor do we carve an exception to this principle simply because the legislator whose motives are proffered actually authored the bill in controversy [citation]; no guarantee can issue that those who supported his proposal shared his view of its compass.' (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].) A legislator's statement is entitled to consideration, however, when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion. (. . . ; see also *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 . . . [declaration of chairman of Cal. Const. Revision Com. considered insofar as it chronicled events leading to proposed amendment].)" (*California Teachers Assn., supra,* 28 Cal.3d at pp. 699-700.) The Supreme Court's distinction of *Stanton* on the ground stated in *California Teachers Assn.,* rather than on the basis that *Stanton* involved a constitutional amendment, indicates that stat-

utes and constitutional provisions are given similar treatment with regard to unexpressed declarations of intent by drafters.

The Supreme Court's reasons for finding unexpressed opinions of statutory intent unpersuasive are equally applicable to constitutional amendments such as the one before us. First, there is no assurance that the personal views of the drafters were shared by anyone else. Second, as was also the case here, unexpressed opinions "may never have been exposed to public view so that those with differing opinions as to the bill's meaning and scope had an opportunity to present their views also." (*California Teachers Assn.*, *supra*, 28 Cal.3d at p. 701.) Thus, general statements in *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372], and *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495 [159 Cal.Rptr. 494, 601 P.2d 1030], that in certain circumstances the intent of the drafters of constitutional amendments may be considered, must be read in light of the limitations set forth in *California Teachers Assn.*

Disregarding, as we must, the postelection declarations of the drafters,[15] we are left with precious little extrinsic evidence of the intent of the voters with respect to the particular provision in question. Although the voters pamphlet analysis of Proposition 13 is a proper extrinsic aid in discerning voter intent (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization*, *supra*, 22 Cal.3d at pp. 245-246), it is not very illuminating on the issue before us. With respect to Proposition 13, the voters pamphlet consisted of a summary of the initiative prepared by the Attorney General (Cal. Voters Pamp., Primary Elec. (June 6, 1978) p. 56), an analysis by the Legislative Analyst (*id.*, pp. 56, 57, 60) and arguments for and against (*id.*, pp. 58-59), together with text of the initiative itself.

The only arguably relevant information in the pamphlet is contained in the Legislative Analyst's analysis, which contained the following statement: "*Restrictions on the growth in assessed values.* Initially this measure would

---

[15]Though it is not the reason we disregard such declarations, it is nonetheless noteworthy that the postelection statements of the two drafters were contradictory in regard to precisely when the inflation factor was properly to be first applied. Mr. Jarvis indicated in his trial testimony that the inflation factor could be applied to raise the 1975 base year value as of July 1, 1978. Mr. Gann, on the other hand, testified that the 1975 values should be used without adjustment for 1978. Furthermore, there is some evidence in the record that in pleadings filed in other litigation involving article XIII A (of which the court below took judicial notice) Mr. Gann made prior inconsistent statements to the effect that the inflation factor was properly applied prior to the July 1, 1978, effective date of article XIII A. In any event, for the reasons set forth in the text, the trial court's reliance on the intent of Messrs. Jarvis and Gann testified to by them at trial was error.

roll back the current assessed values of real property to the values shown on the 1975-76 assessment roll. . . . The adjusted values could *then* be increased by no more than 2 percent per year as long as the same taxpayer continued to own the property." (Cal. Voters Pamp., *supra,* at p. 57, italics added.) Though perhaps the exegetical efforts of a determined talmudic scholar might produce a different conclusion, we do not believe the quoted passage or any other portion of the analysis indicates whether the referent of the word "then" as used by the Legislative Analyst is the first lien date after establishment of the base year value or the first or some other lien date after the effective date of the article. The words tell us nothing more than that the values shown on the 1975-1976 assessment roll can at some point be increased; but they do not tell us when.

Elsewhere in the Legislative Analyst's analysis it is estimated that if Proposition 13 were enacted, "[l]ocal governments would lose about $7 billion in property tax revenues during the 1978-79 fiscal year." (Cal. Voters Pamp., *supra,* at p. 60.) Although the Legislative Analyst did not in the voters pamphlet disclose the basis for this estimate, it was established at trial that its source was a report published by the Legislative Analyst in May 1978 (Cal. Legislative Analyst, An Analysis of Proposition 13—The Jarvis-Gann Property Tax Initiative (May 1978).) The report estimated that property tax revenues for 1978-1979 would be $12.448 billion if the limitations of Proposition 13 were not enacted and $5.404 billion if they were. (*Id.,* at p. 48.) The difference between the two figures is $7.044 billion, the approximate figure which in the voters pamphlet the Legislative Analyst estimated would be lost to local governments if the property tax limitations were enacted.

The May 1978 report reveals that the Legislative Analyst's calculations, and the $7 billion tax revenue loss estimate, were based on the assumption, among numerous others, that "[t]he 'equalized' 1975-76 assessed value of existing real property that did not change hands, increased by the maximum annual reassessment permitted—2 percent—*in each of the subsequent three years.*" (*Id.,* at p. 50, italics added.)[16] In other words, the projections of the Legislative Analyst set forth in the voters pamphlet were based upon the same interpretation of section 2, subdivision (b), that is reflected in the legislation and administrative regulation here in question.

Respondents claim that proponents of Proposition 13 were never provided the May 1978 report and thus had no opportunity to challenge its assertedly

---

[16]It appears that the Legislative Analyst adopted this assumption on the basis of legal advice, as a preliminary section of the study states: "Where provisions of the proposition are unclear or ambiguous, we have based our interpretation on opinions of the Legislative Counsel as to the probable court interpretation." (An Analysis of Proposition 13, *supra,* at pp. 32-33.)

erroneous assumption as to when application of the inflation factor commences. In support of their position that the Legislative Analyst's preelection analysis is entitled to no weight in our determination of the intent of the voters on this issue, respondents rely on *California Comp. & Fire Co. v. State Bd. of Equalization* (1982) 132 Cal.App.3d 25 [182 Cal.Rptr. 745]. It was held in that case that a constitutional amendment repealing a real property tax deduction for insurance companies was effective January 1977, as provided by statute, rather than January 1976, as assumed by the Legislative Analyst in his voters pamphlet analysis estimating the revenue impact of the repeal. On balance, the court rejected the argument for retroactivity of the repeal based on the Legislative Analyst's conjecture because this theory was "totally unpersuasive" and because no other explanation or authority for retroactive application was available. (*Id.,* at pp. 29-30.) The court found that legislative intent was controlling because the Legislature's power to provide tax deductions continued unimpaired following repeal of the constitutional provision. (*Id.,* at p. 31.) However, while the court was not persuaded by the argument based on the Legislative Analyst's analysis, it did not hold that analysis inadmissible and did consider it.

*California Comp.* is factually distinguishable from the present case because the legislative and administrative interpretation here in issue is not in conflict but is consistent with the Legislative Analyst's assumption. Despite this factual distinction, however, the reasoning of *California Comp.* is nonetheless applicable to our analysis. The respondent in that case contended that the source of the Legislative Analyst's estimate was a figure contained in the budget for fiscal year 1976-1977 which the Governor presented to the Legislature in January 1976. The respondent argued "that the Governor's budget is not confidential and is available to any person who seeks a copy thereof from the Office of the Legislative Analyst. Therefore, [the respondent] reasoned, the voting public must have understood that 'the first year' referred to 1976, and consequently must have intended retroactive application of the amendment." (*California Comp. & Fire Co. v. State Bd. of Equalization, supra,* 132 Cal.App.3d at p. 29.) The court, aware that the Governor's budget was certainly not considered by most voters, observed that this argument "is noteworthy only for its creativity." (*Ibid.*)

Similarly, in the present case it is impossible to imagine that any but an insignificant number of voters were alert to the connection between the billion-dollar tax revenue estimates set forth in the Legislative Analyst's voter pamphlet analysis and the commencement date of the inflation factor provision of section 2, subdivision (b). Furthermore, while this connection might have been discerned from a single sentence of a 247-page report that theoretically could have been obtained by an interested voter one month prior to the election, it is doubtful in the extreme that this ponderous doc-

ument, and the recondite sentence upon which appellants rely, received any attention outside very narrow governmental circles.[17] For these reasons, we agree with respondents that the Legislative Analyst's tax revenue estimates set forth in the voter pamphlet and the report that discloses the assumptions used in calculating those estimates have no probative value regarding the intent of the voters with respect to the commencement date of the inflation factor.

No manifestation of the intent of the voters other than those just discounted having been offered or known to us, we are compelled to conclude that extrinsic evidence provides no clue as to when the voters contemplated that the inflation factor would be applied. Indeed, it seems rather evident that the voters never considered the matter at all.

Since the intrinsic ambiguity of article XIII A cannot be resolved by resort to extrinsic evidence of the intent of the voters, we are compelled to determine the validity of the legislative and administrative interpretation by recourse to the applicable rules of constitutional and statutory construction.

## VI.

 Respondents contend that if the language of section 2, subdivision (b), is deemed ambiguous, any doubt about its meaning must be resolved in their favor due to the principle that, as stated in *Pioneer Express Co.* v. *Riley* (1930) 208 Cal. 677 [284 P. 663]: "In every case involving the 'interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.'" (*Id.*, at p. 687, quoting *Gould* v. *Gould* (1917) 245 U.S. 151, 153 [62 L.Ed. 211, 213, 38 S.Ct. 53]; see also *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 476 [183 P.2d 16]; *Estate of Potter* (1922) 188 Cal. 55, 64-65 [204 P. 826]; *Wells Fargo Bank* v. *Cory* (1980) 110 Cal.App.3d 242, 250 [167 Cal.Rptr. 778]; and *Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 93 [290 P.2d 20].)

The rule articulated in *Pioneer Express,* which is by no means hard and fast (see, e.g., *City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d

---

[17]The inside cover of the Legislative Analyst's May 1978 report contained the statement that: "Printing of this report has been limited primarily to anticipated legislative needs. Permission is granted to reproduce it for other purposes as desired." There is no indication in the record before us whether the report was reproduced and if so by whom and for what purposes.

823, 831 [271 P.2d 5]; *Estate of Giolitti* (1972) 26 Cal.App.3d 327, 331 [103 Cal.Rptr. 38, 56 A.L.R.3d 1307]; and *Hospital Service of California* v. *City of Oakland* (1972) 25 Cal.App.3d 402, 405 [101 Cal.Rptr. 800]), has been applied only to the interpretation by administrative agencies of certain types of tax statutes, as the cases that turn upon this rule involve a taxpayer challenge to an allegedly unjustified administrative interpretation of an ambiguous statute levying taxes. But that is not the situation that confronts us here. The statutes and administrative rule at issue in this case are not at all ambiguous and their meaning is not in issue. Rather, the question here is whether the statutes and the administrative rule are compatible with the constitutional provision they construe. The ambiguity is not in the statutes and rule, but in the Constitution. Moreover, the critical factor that most distinguishes this case is that the ambiguous constitutional language in issue has been construed not merely by an administrative agency, but as well by the *Legislature.*

Given the constitutional dimension of the issue and the enactment of a legislative interpretation of the disputed constitutional provision, the applicable rules of construction are quite different from the one upon which respondents rely.[18] ■ For it is well established that " 'where a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. . . . It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.' " (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161] quoting *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].)

■ It is important to understand, in this connection, that "[u]nlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature.

---

[18]Notwithstanding the view of our dissenting colleague, we do not mean to suggest that the general rule that an ambiguous taxing statute must be construed strictly in favor of the taxpayer applies only to administrative interpretations of ambiguous tax statutes. We agree that in certain circumstances the rule may apply to an uncertain tax provision of the Constitution. (See *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 979.) However, mindful "that such a rule does not take precedence over other fundamental rules of statutory construction" (*City of Los Angeles* v. *Belridge Oil Co., supra,* 42 Cal.2d at p. 827), we believe that in this case it must give way to a canon of construction that is rooted in the basic structure of our form of constitutional government, as we explain presently. For this reason, the trial court's reliance on the general rule favoring the taxpayer was error.

[Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by negative implication denied to it by the Constitution. [Citations.] . . . [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. . . . [Citations.]' " (*Methodist Hosp. of Sacramento* v. *Saylor, supra,* 5 Cal.3d at p. 691.)

■■■ This principle is of particular importance in the field of taxation, in which the Legislature is generally supreme. As the Supreme Court has declared, "the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. [Citations.] Its power in the field of taxation is limited only by constitutional restrictions." (*Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 568 [154 P.2d 674].) In other words, the Legislature's authority to impose taxes and regulate the collection thereof exists unless it has been *expressly* eliminated by the Constitution. (*California Comp. & Fire Co., supra,* 132 Cal.App.3d at p. 31.)

■■■ With these principles in mind it becomes clear that the absence in article XIII A of express authority for the legislative interpretation is less significant than the absence in the article of any express or necessarily implied prohibition against such interpretation. For, as stated by our Supreme Court on several occasions, "we do not look to the constitution to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited." (*Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 [57 P.2d 510], quoted with approval in *Methodist Hosp. of Sacramento* v. *Saylor, supra,* 5 Cal.3d at p. 691 and *Collins* v. *Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169]; see also *Hetzel* v. *Franchise Tax Board* (1958) 161 Cal.App.2d 224, 228 [326 P.2d 611] and *Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 740 [57 P.2d 1022].)

■■■ The canons of construction just described collectively create a powerful presumption that a legislative interpretation of a constitutional provision of doubtful meaning is valid. Significantly, the legislative interpretation may prevail regardless whether it can be shown that it is " 'more probably than not' the meaning intended by those who framed or adopted the proposal." (*Methodist Hosp. of Sacramento* v. *Saylor, supra,* 5 Cal.3d at p. 693.) The Legislature's interpretation cannot be declared void "unless there is a *plain and unmistakable* conflict between the statute and the constitution." (*Ibid.,* italics added.)

 The failure of the framers of article XIII A to expressly prohibit application of the inflation factor immediately after the 1975 base year, the fact that such application does not defeat the purpose of the article and reasonably results in the elimination of disparities in tax treatment and other inequities that the article would otherwise create, and the absence of extrinsic evidence that the voters intended the article to have a different meaning, considered together, compel us to conclude that the legislative interpretation is not opposed, and clearly not "positively and certainly" opposed, to the constitution and that the challenged statutes represent a valid exercise of legislative power.[19]

Accordingly, the judgment is reversed.

Miller, J., concurred.

**SMITH, J.**—I respectfully dissent. The question before this court is whether article XIII A, particularly section 2, of the California Constitution is ambiguous and therefore in need of interpretation. According to the majority's reading of section 2, subdivision (b), it is uncertain whether the inflationary factor is to be applied "from year to year" commencing in 1978-1979 or 1975-1976. The majority concludes that because the Board of Equalization, followed by the Legislature, chose the latter date, such action is due great deference and should be followed.

In my opinion article XIII A is clear on its face. When a constitutional provision is clear and unambiguous, there is no need of construction. (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 866 [167 Cal.Rptr. 820, 616 P.2d 802].)

Article XIII A provides the following statutory formula for taxation of real property:

(1) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1 percent) of the full cash value of such property. (§ 1, subd. (a).)

(2) The full cash value means the county assessor's valuation of real property as shown on the 1975-1976 tax bill. (§ 2, subd. (a).)

(3) The full cash value base (amount on 1975-1976 tax bill) may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index. (§ 2, subd. (b).)

---

[19]Since the Board's interpretation of section 2, subdivision (b), is identical to the legislative interpretation reflected in Revenue and Taxation Code sections 51 and 110.1, it is, for that reason, equally valid.

(4) This article shall take effect for the tax year beginning on July 1 following the passage of this amendment (July 1, 1978). (§ 5.)

A constitutional amendment should be given a practical common sense construction in accordance with the natural and ordinary meaning of its words. (*In re Quinn* (1973) 35 Cal.App.3d 473, 482-483 [110 Cal.Rptr. 881].) Article XIII A, save one particular and not here relevant provision, was to "take effect for the tax year beginning July 1 [1978]." The ordinary and common sense meaning of these words of commencement is that any provisions of article XIII A, for example the inflation factor, obviously could not have been applied prior to that date.

Yet the majority, at page 611, suggests that one of the reasonable and consistent explanations of article XIII A is that the inflation "adjustment may commence immediately after 1975; or . . . that the full cash value base for the first lien date after the July 1, 1978, effective date is *calculated* by adjusting the 1975-76 cash value base for each of the three intervening tax years." Concluding that there is nothing in the language of article XIII A to "expressly prohibit *application* of the inflation factor immediately after the 1975-76 base year," the majority thereby sanctions an inflationary increase for each of the three tax years immediately thereafter.

This majority holding begs the question: At what point in time would such "calculation," "adjustment," or "application" be made and take effect? The inflation could only have been "calculated," or inflation "adjustment" or "application" made, *after* the effective date of the article, that is, after July 1, 1978. The majority view results in a "catch-up" inflation amount of 6.12 percent added to the value of the taxpayers' property which is in excess of the "not to exceed 2 percent for any given year" inflation limitation of article XIII A, section 2, subdivision (b).

The majority mistakenly views the base year value, 1975-1976, as a point in time rather than merely an arbitrary base number to be used as part of the article XIII A property tax limitation formula. Logically there can be no retroactive application of an inflation factor—such application must take place in time and therefore in a particular tax year. Once reference is made to any particular tax year, in this case 1978-1979, the 2 percent limit is applicable. The anomalous result here indorsed by the majority had the following impact during 1978-1979: to roll back taxes to the level three years previous, and, at the same time, to raise taxes by an inflation factor that exceeded the annual inflation allowable. I suspect it will come as a great surprise to California voters to find that this "now you see it, now you don't" tortured tax calculation was what they intended in approving Proposition 13 (art. XIII A).

The majority essentially holds that section 2, subdivision (b) is ambiguous because it is capable of two supportable, yet conflicting interpretations, and that neither the language of the section nor extrinsic evidence aids in arriving at the appropriate meaning of section 2, subdivision (b). The majority notes that linguistic distinctions in this case might be too much for even a Talmudic scholar, yet my brethren seem to make a Kierkegaardian "leap into faith" in their reliance upon an administrative/legislative interpretation. I respectfully suggest that neither technique is necessary. Section 2, subdivision (b) cannot be read without reference to section 5. Section 5 commands that "[t]his article shall take effect for the tax year beginning on July 1 [1978]. . . ." Section 2, subdivision (b) provides that increases in the full cash value are "not to exceed 2 percent." There simply is no ambiguity here—"take effect beginning July 1 [1978]" means "take effect beginning July 1 [1978]." Even the majority admits that the aging of the full cash value by this "catch-up" inflation factor takes place in 1978-1979. How then can one escape the 2 percent restriction? One cannot.

The majority dismisses as of no real assistance the Legislative Analyst's analysis in the voters' pamphlet from the June 6, 1978, primary election. The text of that analysis, available to voters at the election adopting Proposition 13 (art. XIII A), was: *"Restrictions on Growth In Assessed Values*: Initially this measure would roll back the current assessed values of real property to the values shown on the 1975-76 assessment roll . . . . The adjusted values could then be increased by no more than 2 percent per year as long as the same taxpayer continued to own the property."

The voters' pamphlet phrase, "Initially this measure would roll back . . . ," must be speaking of a time after July 1, 1978, because prior to that date there was no "measure" in existence capable of a "roll back." Next, the phrase "roll back the current assessed values of real property to the values shown on the 1975-76 assessment roll . . ." means that after July 1, 1978, current property values are to be reduced to the 1975-1976 levels for those who owned their property prior to the 1975 assessment. This language cannot suggest a magical return in time, rather, it must merely explain the use of a valuation year, 1975-1976, as a base year to incorporate into the article XIII A formula. Finally, the sentence, "The adjusted values *could then* be increased by no more than 2 percent . . . ," (italics added) indicates by its future conditional tense that action is to follow after the "roll back" which logically must take place after the effective date of the article. Because an inflationary increase may not exceed 2 percent per year, the 6.12 percent increase taken in 1978-1979 was therefore in violation of the state Constitution.

For reasons expressed above, I find section 2, subdivision (b) to be clear and unambiguous on its face and therefore in need of no construction or

interpretation. But even assuming arguendo that the amendment's language when taken alone is, as the majority concludes, ambiguous by its silence, I believe the majority has abandoned the spirit of the amendment in its rush to embrace a rule of judicial deference to legislative interpretation. In so doing, the majority overlooks our primary duty to give appropriate deference to the voters' exercise of legislative power through the initiative process. Such deference, I believe, requires resolving any initial doubt as to article XIII A's meaning in favor of the people whose exercise of constitutional power created the amendment; and that resolution of initial doubt must be made in the analysis *before* reaching the question of the Legislature's power to interpret constitutional provisions.

We are here concerned with the meaning of a constitutional provision created by voter initiative rather than with the meaning of a statute passed by the Legislature. I would, therefore, examine more closely the principles recognized by the majority as applicable to the interpretation of a constitutional amendment by initiative: " '[t]he intent prevails over the letter, and the *letter* will, if possible, be so read to conform to the *spirit* of the act.' [Citation.] '[T]he courts *must* interpret a constitutional amendment to give effect to the intent of the voters adopting it [citations].' " (*State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 821 [164 Cal.Rptr. 739]; italics added.) To say that it is uncertain whether the voters literally meant to roll back taxes for the 1978-1979 year to 1975-1976 levels, or, whether they really meant, in one tax year, and by a distorted and less than obvious tax calculation, to soften the impact on local government by partially erasing the roll back, ignores the obvious spirit and intent of the amendment.

The voters' constitutionally rooted legislative powers deserve judicial respect and deference on a parity with that afforded the Legislature in its respective domain. Article IV of the state Constitution vests the legislative power of this state in the California Legislature, "but the people reserve to themselves the powers of initiative and referendum." (§ 1.) The Legislature and the people thus have clearly demarked legislative powers. In the 1911 election, which adopted the progressive reforms that established the style of California's state government, the following argument was listed in the voter pamphlet: "The initiative will reserve to the people the power to propose and to enact laws which the legislature may have refused or neglected to enact, and to themselves propose constitutional amendments for adoption." The voters were also told that the initiative "will give the people power to control legislation of the state." "This reservation of power [the initiative] by the People is, in the sense that it gives them the final legislative word, a limitation upon the power of the Legislature." (*Carlson* v. *Cory* (1983) 139 Cal.App.3d 724, 728 [189 Cal.Rptr. 185].)

There is, therefore, no reason to be solicitous of the Legislature's perception of ambiguity. Indeed, "it is the duty of the courts to jealously guard this right of the people and to prevent any action which would improperly annul that right." (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307], commenting on the referendum power.) "Initiatives by their very nature are direct votes of the people and should be given great deference by our courts." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 248 [149 Cal.Rptr. 239, 583 P.2d 1281], conc. and dis. opn. of Bird, C. J.)

This court's duty to guard the people's initiative power against intrusion by the Legislature finds specific support in the Constitution: "The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." (Art. II, § 10, subd. (c).) That provision applicable to initiative *statutes,* should apply with even greater force where a *constitutional amendment* is accomplished by initiative. (Cal. Const., art. XVIII, § 3.) One is left with the conclusion that to extend article XIII A, section 2, to allow a "catch-up" application of the 2 percent inflation factor amounts to improper amendment of the section.

Countering the appellants' ambiguity argument, respondents press for the rule of *Pioneer Express Co.* v. *Riley* which is: "In every case involving the 'interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.'" (*Pioneer Express Co.* v. *Riley* (1930) 208 Cal. 677, 687 [284 P. 663], quoting from *Gould* v. *Gould* (1917) 245 U.S. 151, 153 [62 L.Ed. 211, 213, 38 S.Ct. 53].)

However, the majority suggests, at page 623, that the *Pioneer* rule applies only to "administrative interpretation of an ambiguous statute levying taxes," and continues: "The ambiguity is not in the statutes and rule, but in the Constitution."

Then, to solve this ambiguity, which the majority characterizes as a choice between two "supportable" interpretations, my colleagues rely upon the following rule: "'[W]here a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling.'" (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d

161], quoting from *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].)

I am puzzled by the majority's rejection of the *Pioneer Express* rule of taxpayer preference in tax disputes in favor of the *Methodist Hospital* holding of legislative deference. The majority perceives a hierarchy of rules in which the rule of deference to the Legislature is supreme, and it bolsters this view by observing that cases applying the taxpayer preference rule have, to date, been cases involving administrative interpretation of ambiguous tax statutes, rather than legislative interpretations of ambiguous constitutional provisions. It is not surprising that the taxpayer preference rule has not been applied in the context presented by this case—this context is new, the voters having never before passed so comprehensive a tax limitation initiative, and hence the courts have not yet been called upon to resolve a dispute of this kind between the government and its taxpayers where the provision to be interpreted originated with the taxpayers themselves. With regard to the rule that taxpayer preference must fall to a conflicting rule of legislative deference, I believe the majority states this rule too broadly. The majority relies upon *City of Glendale* v. *Crescenta etc. Water Co.* (1955) 135 Cal.App.2d 784, at page 801 [288 P.2d 105], in which the court noted, "While the general rule is that a taxing statute must be construed strictly in favor of the taxpayer [citations], 'it must also be remembered that such a rule does not take precedence over other fundamental rules of statutory construction. It is fundamental that "judicial construction should be in keeping with the *natural and probable legislative purpose*, and *avoid conflict*, and *harmonize all the applicable provisions of the law* on the subject if possible." (McQuillin, Municipal Corporations, 3d ed., vol. 16, Taxation, § 44.12.) Also where the problem involves the construction of a particular section of a taxing ordinance, the ordinance should be looked to in its entirety and its provisions construed together.' (*City of Los Angeles* v. *Belridge Oil Co.* [1954] 42 Cal.2d 823, 827. . . .)" (Italics added.) Thus *City of Glendale* merely stands for the proposition that preference will not be accorded to taxpayers where to do so would do violence to the evident purpose of the enactment being construed; it does not establish that taxpayer preference should fall to contrary legislative interpretation. In the instant case, following the taxpayer preference rule as to application of the 2 percent maximum inflation factor does violence only to the postinitiative "clarifying" enactments, not to the language or spirit of the initiative itself. After all, the spirit of the article was to substantially reduce the property tax burden, not to have a "sleight of hand" tax computation lower taxes and raise them again in the same year. I would apply the taxpayer preference rule if necessary to resolve ambiguity.

However, I see no ambiguity in article XIII A, section 2, subdivision (b), and find the language clearly states that the inflation factor was not to be

applied until after the effective date. If ambiguity exists, it was created by postpassage acts of the Board of Equalization and the Legislature. The majority travels in circles, permitting the legislation which created their perceived ambiguity to also resolve it.

I would affirm the trial court.

A petition for a rehearing was denied September 23, 1983. Smith, J., was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied November 10, 1983. Grodin, J., did not participate therein. Bird, C. J., and Broussard, J., were of the opinion that the petition should be granted.

---

APPENDIX

ARTICLE XIIIA.

Sec.
1. Ad valorem tax on real property; maximum amount.
2. Full cash value; full cash value base; exclusion of any active solar energy system.
3. Changes in state taxes; enactments to increase revenues; imposition.
4. Special taxes; imposition.
5. Effective date of article.
6. Severability.

§ 1. Ad valorem tax on real property; maximum amount

Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

§ 2. Full cash value; full cash value base; exclusion of any active solar energy system

Sec. 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under "full cash value" or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. For purposes of this section, the term "newly constructed" shall not include real property which is reconstructed after a disaster, as declared by the Governor, where the fair market value of such real property, as reconstructed, is comparable to its fair market value prior to the disaster.

(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value.

(c) For purposes of subdivision (a), the Legislature may provide that the term "newly constructed" shall not include the construction or addition of any active solar energy system.

(d) For purposes of this section, the term "change in ownership" shall not include the acquisition of real property as a replacement for comparable property if the person acquiring the real property has been displaced from the property replaced by eminent domain proceedings, by acquisition by a public entity, or governmental action which has resulted in a judgment of inverse condemnation. The real property acquired shall be deemed comparable to the property replaced if it is similar in size, utility, and function, or if it conforms to state regulations defined by the Legislature governing the relocation of persons displaced by governmental actions. The provisions of this subdivision shall be applied to any property

acquired after March 1, 1975, but shall affect only those assessments of that property which occur after the provisions of this subdivision take effect.

### § 3. Changes in state taxes; enactment to increase revenues; Imposition

Sec. 3. From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed.

### § 4. Special taxes; Imposition

Sec. 4. Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of property within such City, County or special district.

### § 5. Effective date of article

Sec. 5. This article shall take effect for the tax year beginning on July 1 following passage of this Amendment, except Section 3 which shall become effective upon the passage of this article.

### § 6. Severability

Sec. 6. If any section, part, clause, or phrase hereof is for any reason held to be invalid or unconstitutional, the remaining sections shall not be affected but will remain in full force and effect.